SCHOLLE *v.* SECRETARY OF STATE.

1. CONSTITUTIONAL LAW—INTERPRETATIONS BY SUPREME COURT OF THE UNITED STATES.

    Interpretations of the Constitution of the United States by the supreme court of the United States are final authority and constitute exclusive guidance for a State supreme court (US Const, art 3, § 2; art 6, § 2).

2. SAME—SENATORIAL DISTRICTS—EQUAL PROTECTION—ABSENCE OF REMEDY.

    Equal protection and due process clauses of the Fourteenth Amendment, as presently construed by the supreme court of the United States do not prohibit, as a wholly arbitrary classification, a State constitutional amendment which establishes districts substantially unequal in voting power for election of State senators, per DETHMERS, C. J., and CARR, KELLY, and EDWARDS, JJ., and State Supreme Court is powerless to hold invalid a duly-adopted amendment of the State Constitution in the absence of a higher authority for so doing than the State Constitution itself, per BLACK, J., hence, petition for writ of mandamus to invalidate amendment of State Constitution, setting forth senatorial districts generally along county lines and generally favoring thinly populated areas as opposed to densely populous ones in that districts have substantial inequality of population, is dismissed (US Const, art 6, § 2; am 14; Mich Const 1908, art 5, §§ 2, 4, as amended in 1952).

---

* Continued from Volume 359.

REFERENCES FOR POINTS IN HEADNOTES

[1] 14 Am Jur, Courts § 119.
[2] 18 Am Jur, Elections § 17.
    Inequality of population as invalidating apportionment of representation. 2 ALR 1337.
[3] 35 Am Jur, Mandamus § 393.

3. COSTS—PUBLIC QUESTION—INVALIDATION OF PROVISION OF STATE
CONSTITUTION.

> No costs are allowed in mandamus proceeding to invalidate an
> amendment to the State Constitution establishing senatorial
> districts substantially unequal in population, a public question
> being involved (US Const, am 14; Mich Const 1908, art 5, §§ 2,
> 4, as amended in 1952).

SMITH, KAVANAGH, and SOURIS, JJ., dissenting.

Original petition for mandamus by August Scholle, in his own behalf as a citizen and elector in the twelfth Michigan senatorial district, and in a representative capacity as president of the Michigan State Council, AFL-CIO, against James M. Hare, Secretary of State, to command him not to issue 1960 election notices or perform acts requisite to election of State senators under the present senatorial districting, praying that amendments to article 5, §§ 2 and 4, of the Constitution be declared invalid, that said sections in respect to senate apportionment or districting be declared unamended, that the Court declare that no apportionment or districting act is extant, and further praying that the writ command defendant to declare and conduct senatorial elections on an at-large basis until apportionment or districting act can be passed, and further praying that the Court retain jurisdiction pending re-apportionment.

Frank D. Beadle, senator from the thirty-fourth district, and Albert K. Blashfield, a constituent of the thirty-third senatorial district, on their motion, joined as parties defendant. John W. Cummiskey, a constituent of the sixteenth senatorial district, John W. Fitzgerald, senator from the fifteenth district, and Paul C. Younger, senator from the fourteenth district, on their motion to be joined as parties defendant, permitted to intervene.

Submitted February 25, 1960. (Calendar No. 48,580.) Petition for writ dismissed June 6, 1960. Rehearing denied July 11, 1960. Notice of appeal filed in Supreme Court of the United States December 12, 1960.

*Rothe, Marston, Mazey, Sachs & O'Connell (Theodore Sachs,* of counsel), for plaintiff.

*Paul L. Adams,* Attorney General, *Samuel J. Torina,* Solicitor General, *Stanton S. Faville,* Chief Assistant Attorney General, *G. Douglas Clapperton* and *Leon S. Cohan,* Assistants Attorney General, for defendant Secretary of State.

*Edmund E. Shepherd,* for defendants Beadle and Blashfield, and intervenors.

*Amici Curiae:*

*Jerome H. Brooks, Erwin B. Ellmann, Bruce A. Miller,* and *Harold Norris,* for Metropolitan Detroit Branch, American Civil Liberties Union.

*Sheldon L. Klimist, Sheldon Otis,* and *LuVerne Conway,* for Detroit Chapter, Americans for Democratic Action.

KAVANAGH, J. (*dissenting*). This is an original action of mandamus challenging various amendments to the Michigan Constitution (1908) as being violative of the equal protection provision of the Michigan Constitution (1908), art 2, § 1, and of the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution.[1]

---

[1] "All political power is inherent in the people. Government is instituted for their equal benefit, security and protection." Mich Const (1908), art 2, § 1.

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any

Plaintiff, a citizen of the United States and of the State of Michigan, resides in the Michigan twelfth senatorial district and is a qualified elector therein. He is a taxpayer and freeholder of the city of Royal Oak, Oakland county, Michigan. Plaintiff brings this suit individually and as president of the Michigan State AFL–CIO.

The original defendant is the Michigan secretary of State who, as such, is the chief election official of the State of Michigan. Among the duties the secretary of State is required to perform are:

(1) Giving notices of election of State senators.[2]

(2) Receiving nominating petitions or filing fees of candidates for State offices, including State senators in districts comprising more than 1 county.[3]

(3) Certifying the names of candidates who have duly filed for nomination.[4]

(4) Issuing certificates of election to candidates, including State senators in districts comprising more than one county.[5]

By order of the Court, Frank D. Beadle, a State senator, and Albert K. Blashfield, a citizen, were added as parties defendant in the cause. John W. Cummiskey, a citizen, John W. Fitzgerald, and Paul C. Younger, State senators, were permitted to intervene pursuant to the provisions of CL 1948, § 612.11 (Stat Ann § 27.663).

Plaintiff seeks:

(1) A declaration by this Court that Proposition No 3 of the general election of November, 1952, was

---

law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." US Const, am 14, § 1.

[2] CLS 1956, § 168.648 (Stat Ann 1956 Rev § 6.1648).

[3] CLS 1956, § 168.163, as amended by PA 1957, No 125 (Stat Ann 1959 Cum Supp § 6.1163).

[4] CLS 1956, § 168.552, as amended by PA 1958, No 25 (Stat Ann 1959 Cum Supp § 6.1552).

[5] CLS 1956, § 168.845 (Stat Ann 1959 Cum Supp § 6.1845).

an invalid amendment to the Michigan Constitution (1908), art 5, §§ 2 and 4, insofar as the Michigan senate is concerned, in that it denies plaintiff and other citizens of Michigan equal protection of the laws and the due process of law under the Fourteenth Amendment to the United States Constitution and the Michigan Constitution (1908), art 2, § 1.

(2) A declaration by this Court that there exists no valid senate apportioning or districting act extant in pursuance of the Michigan Constitution (1908), art 5, §§ 2 and 4, as unamended.

(3) A peremptory writ of mandamus out of and under the seal of this Court, commanding the defendant secretary of State not to issue 1960 election notices for State senators, nor to otherwise perform those acts requisite to the holding of elections for State senators according to the districts prescribed by the Michigan Constitution (1908), art 5, §§ 2 and 4, as colorably amended by Proposition No 3 of the general election of November, 1952, and by PA 1953, No 77,[6] adopted pursuant thereto, and until such time as the Michigan legislature enacts valid legislation reapportioning the State senatorial districts in accordance with the Michigan Constitution (1908), art 5, §§ 2 and 4, as unamended, and the last Federal decennial census.

(4) The retaining of jurisdiction of this cause by this Court following such determination and the issuance of a writ of mandamus pending an opportunity for the enactment of timely, valid reapportionment legislation by the present Michigan legislature, on failure of which the defendant secretary of State further be directed to declare and conduct the 1960 election for State senators on an at-large basis and to take all necessary and appropriate steps therefor, the at-large method only to continue until

6 CLS 1956, §§ 4.601, 4.602 (Stat Ann 1959 Cum Supp §§ 2.27[1], 2.27[2]).

such time as the Michigan legislature enacts legislation reapportioning the State senatorial districts pursuant to the Michigan Constitution (1908), art 5, §§ 2 and 4, as unamended, and in accordance with the last Federal decennial census.

Plaintiff's petition sets forth that the Michigan Constitution (1908), art 5, §§ 2, 3, and 4, respecting legislative districting and apportionment was colorably amended by Proposition No 3[7] in the general

---

[7] "The senate shall consist of 34 members. Senators shall be elected for 2 years and by single districts. Such districts shall be numbered from 1 to 34, inclusive, and shall consist of the territory within the boundary lines of the counties existing at the time of the adoption of this amendment, as follows: First through fifth, eighteenth, twenty-first, Wayne county; nineteenth, Lenawee and Monroe counties; tenth, Jackson and Hillsdale counties; ninth, Calhoun and Branch counties; sixth, Kalamazoo and St. Joseph counties; seventh, Cass and Berrien counties; eighth, Van Buren, Allegan and Barry counties; fourteenth, Ingham and Livingston counties; twelfth, Oakland county; eleventh, Macomb county; twentieth, Tuscola, Sanilac and Huron counties; thirteenth, Genesee county; fifteenth, Clinton, Shiawassee and Eaton counties; sixteenth and seventeenth, Kent county; twenty-third, Muskegon and Ottawa counties; twenty-fifth, Mecosta, Montcalm, Gratiot and Ionia counties; twenty-second, Saginaw county; twenty-fourth, Bay, Midland and Isabella counties; twenty-sixth, Newaygo, Oceana, Mason, Lake and Manistee counties; twenty-eighth, Osceola, Clare, Gladwin, Arenac, Iosco, Ogemaw, Roscommon, Crawford, Oscoda and Alcona counties; twenty-seventh, Missaukee, Wexford, Benzie, Grand Traverse, Kalkaska, Leelanau and Antrim counties; twenty-ninth, Charlevoix, Emmet, Cheboygan, Otsego, Montmorency, Alpena and Presque Isle counties; thirtieth, Chippewa, Mackinac, Luce, Schoolcraft, Alger, Menominee and Delta counties; thirty-first, Marquette, Dickinson, Iron and Gogebic counties; thirty-second, Baraga, Keweenaw, Houghton and Ontonagon counties; thirty-third, Washtenaw county; thirty-fourth, Lapeer and Saint Clair counties. Each of the 34 districts shall elect 1 senator. Counties entitled to 2 or more senators shall be divided into senatorial districts as herein provided equal to the number of senators to be elected; said districts shall contain as nearly as may be an equal number of inhabitants and shall consist of convenient and contiguous territory; and said districts shall be arranged during the year 1953, by the board of supervisors in such counties assembled at such time and place as prescribed by law." Michigan Constitution (1908), art 5, § 2.

"The house of representatives shall consist of not more than 110 members. Representatives shall be chosen for 2 years and by single districts except as otherwise provided herein, which shall contain as nearly as may be an equal number of inhabitants and shall consist of convenient and contiguous territory. The ratio of representation for representative districts shall be the quotient

election held November 4, 1952. Among other
things, the 1952 amendment increased the size of

obtained by dividing the total population of the State as deter-
mined by the latest or each succeeding official Federal decennial
census by 100. Each county, or group of counties forming a rep-
resentative district, shall be entitled to a separate representative
when it has attained a population equal to 50 per cent of the ratio
of representation, and in addition thereto, shall be entitled to 1
additional representative for each additional full ratio of represen-
tation. In every county entitled to more than 1 representative,
the board of supervisors shall assemble at such time and place as
shall be prescribed by law, divide the same into representative
districts, which shall contain as nearly as may be an equal number
of inhabitants and shall consist of convenient and contiguous
territory, equal to the number of representatives to which such
county is entitled by law, and shall cause to be filed in the offices
of the secretary of State and clerk of such county a description of
such representative districts, specifying the number of each district
and the population thereof according to the latest or each succeeding
official Federal decennial census: Provided, That no township or city
shall be divided in the formation of a representative district, except
that when a city is composed of territory in more than 1 county,
it may be divided at the county line or lines: Provided further,
That in the case of cities hereafter organized or created or terri-
tory annexed to an existing city, the territory thereof shall remain
in its present representative district until the next apportionment:
And provided further, That when any township or city contains
a population which entitles it to more than 1 representative, then
such township or city shall elect by general ticket the number
of representatives to which it is entitled; except that when such
township or city shall be entitled to more than 5 representatives,
then such township or city shall be divided into representative
districts containing as near as may be an equal number of in-
habitants and consisting of convenient and contiguous territory,
but with not less than 2 nor more than 3 representatives in any
1 district: Provided, That the average number of inhabitants per
representative in such districts shall be as nearly equal as possible."
Michigan Constitution (1908), art 5, § 3.

"Within the first 180 days after the convening of the first reg-
ular session, or after the convening of any special session called
for that purpose, following January 1, 1953, and each tenth year
thereafter, the legislature shall apportion anew the representatives
among the counties and districts in accordance with section 3
of this article, using as the basis for such apportionment the last
United States decennial census of this State: Provided, however,
That should the legislature within the first 180 days after the
convening of the first regular session, or after the convening of
any special session called for that purpose, following January 1,
1953, and each tenth year thereafter, fail to apportion anew the
representatives in accordance with the mandate of this article,
the board of State canvassers, within 90 days after the expiration
of said 180 days, shall apportion anew such districts in accordance
with the provisions of this article and such apportionment shall
be effective for the next succeeding fall elections." Michigan
Constitution (1908), art 5, § 4.

the senate from 32 to 34 members, to be elected from single member districts identical, except as to 2 changes, with the pre-amendment districts. Further, Proposition No 3 as to senate apportionment abandoned the decennial reapportionment on a population basis previously required and thereby perpetually froze such existing districts, no matter what great changes or disparities of population might thereafter take place throughout the State (as they actually have since 1952).

The petition also sets forth that the districts in effect frozen in the 1952 amendment were established in 1925 by PA 1925, No 291,[8] in rough reliance upon the 1920 Federal decennial census.

The petition states that despite the requirement of previous constitutional provisions[9] the legisla-

[8] CL 1948, § 4.1 (Stat Ann 1952 Rev § 2.1).

[9] "The senate shall consist of 32 members. Senators shall be elected for 2 years and by single districts. Such districts shall be numbered from 1 to 32, inclusive, each of which shall choose 1 senator. No county shall be divided in the formation of senatorial districts, unless such county shall be equitably entitled to 2 or more senators." Michigan Constitution (1908), art 5, § 2.

"The house of representatives shall consist of not less than 64 nor more than 100 members. Representatives shall be chosen for 2 years and by single districts, which shall contain as nearly as may be an equal number of inhabitants and shall consist of convenient and contiguous territory; but no township or city shall be divided in the formation of a representative district, except that when a city is composed of territory in more than 1 county, it may be divided at the county line or lines: And provided, That in the case of cities hereafter organized or created or territory annexed to an existing city, the territory thereof shall remain in its present representative district until the next apportionment. When any township or city shall contain a population which entitles it to more than 1 representative, then such township or city shall elect by general ticket the number of representatives to which it is entitled. Each county, with such territory as may be attached thereto, shall be entitled to a separate representative when it has attained a population equal to a moiety of the ratio of representation. In every county entitled to more than 1 representative, the board of supervisors shall assemble at such time and place as shall be prescribed by law, divide the same into representative districts equal to the number of representatives to which such county is entitled by law, and shall cause to be filed in the offices of the secretary of State and clerk of such county a description of such representative districts, specifying the number of each district and population thereof ac-

ture neglected and failed its decennial reapportion-
ment duty so that, at the time of the 1952 election,
there existed variations exceeding 8 to 1 in district
population, for example, 61,000 persons in the thirty-
second district (Baraga, Keweenaw, Houghton, and
Ontonagon counties) as compared to 544,000 in the
eighteenth district (Wayne county) and 530,000 in
the then twelfth district (Oakland and Washtenaw
counties).

The petition points out that on the basis of pro-
jected 1960 figures, plaintiff's district will have
724,000 persons, while the smallest, the thirty-second
district, will have only 49,000, a variance of 15 to 1.
Similar projections for 1970 show an average dis-
trict population of 298,000 persons, with the largest,
the twelfth district, to have 1,056,000, and the small-
est, the thirty-second district, to have but 41,000
persons, a variance of 25 to 1.

Plaintiff further alleges, and it is not denied by
any of the defendants, that in the 1958 election 12
senators were elected from primarily urban areas
in which the average population of the districts was
266,118 (according to the 1950 census figures) to
represent 3,193,417 people. Twenty-two senators
were elected from districts of average population of
144,470, or slightly more than half as large, to repre-
sent fewer people, a total of 3,178,349. According-
ly, less than half of the population of the State there-
by gained control of almost 2/3 of the Michigan
senate.

---

cording to the last preceding enumeration." Michigan Constitution
(1908), art 5, § 3.

"At the session in 1913, and each tenth year thereafter, the
legislature shall by law rearrange the senatorial districts and
apportion anew the representatives among the counties and dis-
tricts according to the number of inhabitants, using as the basis
for such apportionment the last preceding United States census of
this State. Each apportionment so made, and the division of
any county into representative districts by its board of super-
visors, made thereunder, shall not be altered until the tenth year
thereafter." Michigan Constitution (1908), art 5, § 4.

The petition illustrates that the net effect of all the foregoing is that the plaintiff's vote and right of representation in the Michigan senate (according to 1960 projections) is but 1/15 of those voting and representation rights of a citizen in the thirty-second district.

It is further disclosed that the districts under Proposition No 3 have no correlation between size and representation. It is shown by exhibit that the average district size is 1,677 square miles, the Wayne county district average size is 86.7 square miles, while the twenty-eighth and thirtieth districts are 63 and 90 times as large, being respectively 5,471 and 7,832 square miles. Plaintiff further points out that other districts vary drastically in size and that actually districts side by side (presumably having thereby comparable regional characteristics) have similar great variations in area and in population.

Finally, plaintiff shows that no uniform correlation between district size and political units exists. Plaintiff contends that the method of division of senatorial districts is palpably arbitrary and capricious and has no criterion to determine the relationship of one district to another.

Plaintiff alleges that by virtue of the above-stated facts he is denied equal protection of the laws and due process of law under the Fourteenth Amendment to the United States Constitution and under the Michigan Constitution (1908), art 2, § 1. He asks a declaration that the 1952 amendment be declared invalid and inoperative, and seeks this relief through writ of mandamus.

Defendant secretary of State answers the petition saying:

(1) The relief sought by plaintiff requires solution of a political issue which cannot be resolved by judicial decision.

(2) Senatorial districting on a basis of area does not deny a republican form of government.

(3) The equal protection of the laws provision of the Fourteenth Amendment to the United States Constitution is not violated, since—

(a) There is no discrimination within a unit;

(b) Area representation is proper and valid;

(c) The Negro voting cases do not apply to the question; and

(d) Constitutions of States seeking admission to the Union, and providing for legislative apportionment on some basis other than population, have been approved by Congress and the President subsequent to the adoption of the Fourteenth Amendment to the United States Constitution.

(4) The due process clause of the Fourteenth Amendment to the United States Constitution is not violated as—

(a) Area representation does not violate the due process clause of the United States Constitution; and

(b) Area representation conforms with our democratic traditions.

(5) To forbid area representation would require the elimination of similar representative methods throughout our democratic system such as representation on—

(a) The county board of supervisors;

(b) City precincts; and

(c) Other levels of area representation.

(6) The relief prayed for by plaintiff cannot be granted for the following reasons:

(a) If this Court declares the 1952 amendment to article 5 of the Michigan Constitution (1908) invalid, there will remain no legislative body either *de jure* or *de facto* with power to rearrange senatorial districts and reapportion the legislature;

(b) Under a holding by this Court that a *de facto* legislature exists, the composition of the State senate would be unknown;

(c) If the legislature, whether *de facto* or *de jure,* refuses to reapportion, this Court has no power to compel action by mandamus or otherwise;

(d) The Michigan Constitution (1908) prevents holding elections at large for the office of State senator; and

(e) The plaintiff has an adequate remedy by seeking amendment of the State Constitution by vote of the electors.

The other defendants answer the petition alleging in substance the same arguments.

Briefs have been filed on behalf of all the defendants, and, in addition thereto, *amicus* briefs have been filed by the Metropolitan Detroit Branch of the American Civil Liberties Union and the Detroit Chapter of Americans for Democratic Action.

The present controversy is not a new one. It is as old as representative government. It has been kept new through the centuries by people seeking their natural rights, under the banner of freedom, from tyrannical denial of these rights. The first real natural expression of these rights is found in the Declaration of Independence, which reads in part as follows:

"We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty and the pursuit of happiness.—That to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed."

From the moment of its conception this Country has been dedicated to the equal application of our laws. Following the adoption of the United States Constitution, when questions arose as to whether the

equal application of our laws was a part of our Constitution, the Fourteenth Amendment was adopted in 1868, and ratified by the States, to eliminate for all time any question with respect to equal protection of the rights of citizens. During the course of our history a bloody civil war was fought in the name of equality. Within the past 50 years 2 world wars have been participated in by this Nation in the interests of freedom and justice. Free elections and equal representation during the last several years have dominated our foreign policy. Germany, Korea, and Poland are but a few of the countries in which we have attempted to obtain for the oppressed equal justice under law. The present controversy in this Country has been the subject of considerable litigation in both State and Federal courts. It has become a constant source of increasing national concern and attention. The subject has received extensive treatment under the heading of legislative reapportionment in numerous law review articles, and in magazines and editorial comments of our newspapers. Parenthetically, would it not be ludicrous were we, in our interest in establishing our system of justice and equality under law in other nations of the world, to find ourselves losing it at home. To most southern segregationists it would be amusing to hear the argument presented that "the people have a right to be wrong" and that the people can be deprived of their constitutional rights guaranteed by the Federal Constitution as long as it is done by constitutional amendment rather than by statute. Some of the States desiring segregated schools have passed such amendments to their constitutions, but either have seen them stricken down by the courts or have voluntarily abandoned their position under them. *Shuttlesworth* v. *Birmingham Board of Education* (ND Ala), 162 F Supp

372; *Gibson* v. *Board of Public Instruction of Dade County, Florida* (SD Fla), 170 F Supp 454.

In *Hamilton* v. *Secretary of State,* 212 Mich 31, Justice Fellows, who was joined by Justices Brooke and Clark in the dissenting opinion, referring to a proposed State constitutional amendment said (p 43) :

"If it abridges the privileges or immunities of the citizen or deprives him of life, liberty or property without due process of law it must fall before the superior mandate of the Federal Constitution whether it be a State statute or a provision of a State Constitution."

The majority opinion did not pass on this question since they ruled that the writ of mandamus must issue to require the secretary of State to present the proposed constitutional amendment to the people, indicating that the Court had no right to pass on a constitutional amendment until after adoption. Certainly, they did not indicate a disagreement with the above quotation from the opinion of Justice Fellows.

Similarly bearing on the right of the people to adopt any kind of amendment they desire, when the people of Oregon by initiative measure, adopted by the people, amended their school law requiring parents and others having control of young children to send them to the primary schools of the State, the United States supreme court in the case of *Pierce* v. *Society of Sisters,* 268 US 510 (45 S Ct 721, 69 L ed 1070, 39 ALR 468), held such an act violated the Federal Constitution and struck it down.

In *Bute* v. *Illinois,* 333 US 640 (68 S Ct 763, 92 L ed 986), the court said (p 670) :

"It is our province to decide whether the practice of the Illinois court in these cases, although admittedly in conformity with the law of Illinois, was so clearly at variance with procedure constituting 'due

process of law' under the Fourteenth Amendment that these sentences must be completely invalidated."

Defendants also contend senatorial districting on a basis of area does not deny a republican form of government. Plaintiff admittedly does not rely upon article 4, § 4, of the United States Constitution, guaranteeing a republican form of government, either for jurisdiction or relief. Defendants further contend that to forbid area representation would require the elimination of similar representative methods, such as the county board of supervisors, city precincts, and other levels of area representation. We do not have this question before us; and if we did, we do not think defendants' reasoning would necessarily follow.

Defendants further allege that if the 1952 amendment is declared invalid, there would remain no legislative body with power to rearrange senatorial districts and reapportion the legislature. This argument needs little discussion. There exists at the present time a legislative body charged by the Constitution (if the 1952 amendment is invalid) with the duty to rearrange senatorial districts and reapportion the legislature. This it can do. We must assume when its legal and constitutional duty is pointed out to it, the legislature will carry out its responsibility in this regard without any need for compulsion. It is not to be presumed that the legislature would refuse to take such action as is necessary to comply with its duty under the State Constitution. We do not believe it would deliberately fail to perform its duty. Experience teaches us that legislatures so acted in Michigan, Minnesota, and Hawaii following court decisions. See: *Giddings* v. *Secretary of State,* 93 Mich 1 (16 LRA 402); *Magraw* v. *Donovan* (Minn), 163 F Supp 184; *Dyer* v. *Kazuhisa Abe* (Hawaii), 138 F Supp 220.

It would appear that the remaining contentions of plaintiff and the defenses of the defendants can be best discussed under the following 3 questions:

(1) Does a mandamus suit, directed to the secretary of State, challenging the 1952 amendment to article 5, §§ 2 and 4, of the Michigan Constitution, on grounds of conflict with the United States Constitution, Fourteenth Amendment, and the Michigan Constitution (1908), art 2, § 1, present a justiciable controversy of which this Court has jurisdiction?

(2) Does the 1952 initiative amendment to article 5, §§ 2 and 4 (by "Proposition 3"), respecting the Michigan senate, violate the equal protection of the laws and due process clauses of the Fourteenth Amendment to the United States Constitution and article 2, § 1, of the Michigan Constitution?

(3) May and should the Court grant the remedy prayed—a declaration of invalidity of the 1952 initiative amendment as to the senate, mandamus to restrain the holding of 1960 elections under the 1952 districting, the retaining of jurisdiction pending due and timely reapportionment under the previous constitutional provisions and the last Federal decennial census by the legislature itself, and—only in the event of prior legislative failure to duly reapportion—the holding of elections at large?

It is defendants' view that congressional or even legislative apportionment is purely a political question and, therefore, should be avoided by the courts. Defendants rely mainly upon Federal cases in this regard, beginning with the case of *Colegrove* v. *Green,* 328 US 549 (66 S Ct 1198, 90 L ed 1432). In this case the supreme court refused to consider the validity or the equities or inequities of a congressional apportionment statute of Illinois with its possible resulting conflict between congress and the State. In this case 7 justices were sitting. Four justices believed the court had jurisdiction to decide

the issue; 3 justices believed it lacked jurisdiction; Justice Rutledge, in a concurring opinion, agreed the court had jurisdiction but, believing equity jurisdiction is discretionary, and because of lack of time to change the election machinery in the congressional districts involved, he therefore, in the exercise of the court's discretion, voted to deny relief. Thus, contrary to defendants' position, a majority of the justices participating in the *Colegrove* decision felt the court had jurisdiction to decide the issue.

In the case of *MacDougall* v. *Green,* 335 US 281 (69 S Ct 1, 93 L ed 3), complainant sought an injunction against the enforcement of a statute of Illinois setting out the requirements for a new political party. The district court found want of Federal jurisdiction and denied the injunction. The supreme court of the United States, in its *per curiam* opinion, observed that the State has the power, in pursuance of State policy, to assure *a proper diffusion* of political initiative between thinly populated counties and the concentrated masses, and that this would not violate any provisions of the Federal Constitution. Five justices joined in the *per curiam* opinion denying jurisdiction for reasons set forth in *Colegrove* v. *Green, supra.* Justice Rutledge again concurred on the ground that equity should decline to exercise its jurisdiction because the question was presented on the eve of a national election, only 12 days away, and to grant relief at that time would unquestionably disenfranchise certain groups of voters. Justice Rutledge concluded his opinion as follows (p 287):

"Accordingly, I express no opinion concerning the constitutional and other questions presented. As in *Colegrove* v. *Green,* 328 US 549 (66 S Ct 1198, 90 L ed 1432), I think the case is one in which, for the reasons stated, this court may properly, and should, decline to exercise its jurisdiction in equity.

Accordingly, but solely for this reason, I agree that the judgment refusing injunctive relief should be affirmed."

Justices Douglas, Black, and Murphy dissented, holding (p 288):

"Free and honest elections are the very foundation of our republican form of government. * * * Discrimination against any group or class of citizens in the exercise of these constitutionally protected rights of citizenship deprives the electoral process of integrity. * * *

"None would deny that a State law giving some citizens twice the vote of other citizens in either the primary or general election would lack that equality which the Fourteenth Amendment guarantees. See *Nixon* v. *Herndon,* 273 US 536 (47 S Ct 446, 71 L ed 759)."

It is to be noted that the important language in the *per curiam* opinion is the *"proper diffusion."* With this, we do not disagree. To constitute proper diffusion, there must be rational treatment of all within a class. If population is not the rational criterion under Proposition No 3, it naturally follows that some other criterion, uniformly, rationally, and nondiscriminatorily applied, must be used. It is not necessary that the apportionment by population be exact. In fact, perfect exactness in apportionment, even if obtainable, would be removed upon the subsequent death or birth of an individual. The supreme court of Wisconsin in *State, ex rel. Attorney General,* v. *Cunningham,* 81 Wis 440 (51 NW 724, 15 LRA 561), said (p 484):

"Perfect exactness in the apportionment according to the number of inhabitants is neither required nor possible. * * * If, as in this case, there is such a wide and bold departure from this constitutional rule that it cannot possibly be justified by the exercise of any judgment or discretion, and that

evinces an intention on the part of the legislature to utterly ignore and disregard the rule of the Constitution in order to promote some other object than a constitutional apportionment, then the conclusion is inevitable that the legislature did not use any judgment or discretion whatever."

In the cases of *South* v. *Peters,* 339 US 276 (70 S Ct 641, 94 L ed 834), *Cook* v. *Fortson* and *Turman* v. *Duckworth,* 329 US 675 (67 S Ct 21, 91 L ed 596), *Radford* v. *Gary,* 352 US 991 (77 S Ct 559, 1 L ed 2d 540), *Kidd* v. *McCanless,* 352 US 920 (77 S Ct 223, 1 L ed 2d 157), and other cases cited by the defendants, the supreme court of the United States merely entered *per curiam* opinions (with several dissents) citing *Colegrove* v. *Green, supra,* and *MacDougall* v. *Green, supra,* as authority for the position that Federal courts had consistently refused to exercise their equity powers in cases arising from a State's geographical distribution of electoral strength among its political subdivisions. All other cases cited are from lower Federal courts, which, on the authority of *Colegrove* and *MacDougall* have declined to enter the field.

A 3-judge court in the district court of the United States for the middle district of Tennessee, Nashville division, on December 21, 1959, in the case of *Baker* v. *Carr,* 179 F Supp 824, clearly set forth the position of the Federal courts in a *per curiam* opinion in which they said (p 826):

"The question of the distribution of political strength for legislative purposes has been before the supreme court of the United States on numerous occasions. From a review of these decisions there can be no doubt that the Federal rule, as enunciated and applied by the supreme court, is that the Federal courts, whether from a lack of jurisdiction or from the inappropriateness of the subject matter for judicial consideration, will not intervene in cases of

this type to compel legislative reapportionment. *Colegrove* v. *Green,* 328 US 549 (66 S Ct 1198, 90 L ed 1432); *Cook* v. *Fortson* and *Turman* v. *Duckworth,* 329 US 675 (67 S Ct 21, 91 L ed 596); *Colegrove* v. *Barrett,* 330 US 804 (67 S Ct 973, 91 L ed 1262); *MacDougall* v. *Green,* 335 US 281 (69 S Ct 1, 93 L ed 3); *South* v. *Peters,* 339 US 276 (70 S Ct 641, 94 L ed 834); *Remmey* v. *Smith,* 342 US 916 (72 S Ct 368, 96 L ed 685); *Anderson* v. *Jordan,* 343 US 912 (72 S Ct 648, 96 L ed 1328); *Kidd* v. *McCanless,* 352 US 920 (77 S Ct 223, 1 L ed 2d 157); *Radford* v. *Gary,* 352 US 991 (77 S Ct 559, 1 L ed 2d 540).

"In view of this array of decisions by our highest court, charting the unmistakable course which this court must pursue in the instant case, it is unnecessary to consider decisions by lower Federal courts."

In the same case the court further said (p 828):

"With the plaintiffs' argument that the legislature of Tennessee is guilty of a clear violation of the State constitution and of the rights of the plaintiffs the court entirely agrees. It also agrees that the evil is a serious one which should be corrected without further delay."

In *Dyer* v. *Kazuhisa Abe,* 138 F Supp 220, 234, the United States district court for the district of Hawaii, on February 10, 1956, said, since it was a Federal court ruling with respect to territorial officers, the rules in *Colegrove* v. *Green, supra, MacDougall* v. *Green, supra,* and others, did not apply. It was in the same position in this regard as a State court would be in ruling with respect to State officials. The United States district court had authority over territorial officials. The delicate area of State-Federal relations mentioned in *Colegrove, supra,* and *MacDougall, supra,* was not involved.

It is apparent, then, that the cases relied upon by the defendants do not decide that a State court cannot determine the Federal constitutionality of a

State statute or State constitutional provision which apportions legislative districts. Inferentially at least, they hold that the State court is the one to consider these questions. The United States supreme court has held that it is the duty of State courts to interpret and enforce obedience to the Constitution of the United States and to restrain any violation thereof.

In the case of *In re Green River Drainage Area,* 147 F Supp 127, citing *Robb* v. *Connolly,* 111 US 624, 637 (4 S Ct 544, 28 L ed 542), the court said (p 148):

"Upon the State courts, equally with the courts of the Union, rests the obligation to guard and enforce every right secured by the Constitution and laws of the United States whenever those rights are involved in any suit or proceeding before them."

The United States supreme court in *United States* v. *Bank of New York & Trust Co.,* 296 US 463, 479 (56 S Ct 343, 80 L ed 331), employed the identical language above quoted in holding that both State and Federal courts have the obligation to enforce every constitutional right secured by the United States Constitution. See, also, *Testa* v. *Katt,* 330 US 386 (67 S Ct 810, 91 L ed 967, 172 ALR 225).

In *Irvin* v. *Dowd,* 359 US 394 (79 S Ct 825, 3 L ed 2d 900), the court said (p 404):

"In this way, in our view, the State supreme court discharged the obligation which rests upon 'the State courts, equally with the courts of the Union,  *  *  * to guard, enforce, and protect every right granted or secured by the Constitution of the United States.' *Robb* v. *Connolly,* 111 US 624, 637."

Justice BUTZEL, writing in *Book Tower Garage* v. *Local No. 415,* 295 Mich 580, said (p 587):

"It is the duty of the State courts as well as the courts of the Nation to guard and enforce every

right secured by the Federal Constitution. *Robb* v. *Connolly*, 111 US 624 (4 S Ct 544, 28 L ed 542); *Mooney* v. *Holohan*, 294 US 103 (55 S Ct 340, 79 L ed 791, 98 ALR 406). The Federal Constitution is 'the supreme law of the land; and the judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' (Art 6, § 2)."

It is apparent then that, since the Federal courts have refused to enter the field and since the supreme court of the United States has not ruled on the question of whether an illegal reapportionment violates the Fourteenth Amendment to the Constitution of the United States, this Court, clearly having jurisdiction to hear the case, has the duty to dispose of the question since a justiciable issue has been raised by this action.

Legislative reapportionment is not before the Supreme Court of the State of Michigan for the first time, for it was the subject of rulings by this Court as early as 1892—*Board of Supervisors of Houghton County* v. *Secretary of State,* 92 Mich 638 (16 LRA 432), and *Giddings* v. *Secretary of State,* 93 Mich 1 (16 LRA 402). As a consequence, we do not have to look outside this State to determine whether or not a justiciable controversy exists over which this Court has jurisdiction.

*Giddings* v. *Secretary of State, supra,* establishes adequate precedent for the Court's jurisdiction of this suit. There, the Michigan Supreme Court struck down a statute of this State which failed to comply with the provisions of the Constitution with reference to equal representation. Three opinions written for a unanimous Court laid a factual situation which is equally applicable to the gerrymandering that took place prior to and in the adoption of the 1952 Proposition No 3. There the Court discussed all of the objections that are presented by the defendants in this case as to why this Court

does not have jurisdiction of the controversy. Justice GRANT, writing for the Court, there said (pp 3, 4, 7, 9):

"It appears conceded by the learned attorney general that the legislature is not in the exercise of a political and discretionary power when acting under these constitutional provisions, for which it is only amenable to the people, and that this Court has jurisdiction, in a case properly before it, to determine the constitutionality of the act in question. The Constitution of this State provides:

" 'The Supreme Court shall have a general superintending control over all inferior courts, and shall have power to issue writs of error, *habeas corpus, mandamus, quo warranto, procedendo,* and other original and remedial writs, and to hear and determine the same. In all other cases it shall have appellate jurisdiction only.'[10]

"The general jurisdiction of this Court to determine the constitutionality of legislative enactments is not limited so as to exclude laws involving political rights. The Constitution of Wisconsin, in conferring jurisdiction upon its supreme court, is nearly identical in language with the Constitution of this State. The supreme court of Wisconsin has recently most ably and thoroughly discussed and determined the jurisdiction of the court in a case similar in principal and its facts to the present one. *State, ex rel. Attorney General,* v. *Cunningham,* 81 Wis 440 (51 NW 724, 15 LRA 561). The authorities in support of the jurisdiction are there collated, and citations made from them. Were the power conferred upon the legislature one of absolute discretion, then the express mandate, 'shall rearrange according to the number of inhabitants,' would be void of any force or meaning, except that it might be regarded as expressive of the opinion of the framers of the Constitution that such method would

---

[10] Const (1850), art 6, § 3 (now Const 1908, art 7, § 4).—
REPORTER.

be equitable and fair. We have no doubt of the jurisdiction of the Court. * * *

"It was never contemplated that 1 elector should possess 2 or 3 times more influence, in the person of a representative or senator, than another elector in another district. Each, in so far as it is practicable, is, under the Constitution, possessed of equal power and influence. Equality in such matters lies at the basis of our free government. It is guaranteed, not only by the Constitution, but by the ordinance of 1787, organizing the territory out of which the State of Michigan was carved. * * *

"Our conclusions therefore are:

"1. The petition is properly brought into this Court by the relator.

"2. The Court has jurisdiction in the matter.

"3. The apportionment acts of 1891 and 1885 are unconstitutional and void.

"4. The writ of mandamus must issue, restraining the respondent from issuing the notice of election under the act of 1891, and directing him to issue the notice under the apportionment act of 1881, unless the executive of the State shall call a special session of the legislature to make a new apportionment before the time expires for giving such notice."

Chief Justice MORSE in a concurring opinion in the same case said (pp 10, 11):

"The legislature in the senatorial apportionment of 1891 went far beyond any legitimate discretion, and violated the rules of equity, when it was not necessary, or even proper, to do so. * * * The twenty-seventh and twenty-ninth districts lie contiguous to each other, so that there was no excuse for putting 97,330 people in one and only 40,033 in the other."

The Chief Justice went on to say (p 11) that neither of the senatorial apportionments were

"arranged in view of the Constitution or the rights of the electors of this State. While it is true that

the motive of an act need not be inquired into to test its constitutionality, I believe that the time for plain speaking has arrived in relation to the outrageous practice of gerrymandering, which has become so common, and has so long been indulged in, without rebuke, that it threatens not only the peace of the people, but the permanency of our free institutions. The courts alone, in this respect, can save the rights of the people, and give to them a fair count and equality in representation. It has been demonstrated that the people themselves cannot right this wrong. They may change the political majority in the legislature, as they have often done, but the new majority proceeds at once to make an apportionment in the interest of its party, as unequal and politically vicious as the one that it repeals. There is not an intelligent school boy but knows what is the motive of these legislative apportionments, and it is idle for the courts to excuse the action upon other grounds, or to keep silent as to the real reason, which is nothing more nor less than partisan advantage taken in defiance of the Constitution, and in utter disregard of the rights of the citizen."

Justice McGRATH, in a concurring opinion in the same case, speaking of equality of representation, said (p 13):

"Any apportionment which defeats that purpose is vicious, contrary not only to the letter of the Constitution, but to the spirit of our institutions, and subversive of popular government. Power secured or perpetuated by unconstitutional methods is power usurped, and usurpation of power is a menace to free institutions."

These are strong words, but if the situation called for strong words in the year 1892, the situation in 1960 demands even stronger ones, because the extenuated circumstances from 1892 to date have reaped an even greated reward for those who prefer unrepresentative government.

The same rule with respect to jurisdiction is found in *Board of Supervisors of Houghton County* v. *Secretary of State,* 92 Mich 638 (16 LRA 432), *Williams* v. *Secretary of State,* 145 Mich 447, and *Stevens* v. *Secretary of State,* 181 Mich 199. These present adequate answers as to whether the State Court has jurisdiction to decide the questions involved, particularly with reference to the question of a political issue.

It is admitted by the defendants in their briefs that the Michigan Supreme Court has ruled several times on the meaning of the equal protection of the laws provisions of the United States and the Michigan Constitutions. In *Tomlinson* v. *Tomlinson,* 338 Mich 274, this Court said (p 278):

"The guaranty of equal protection of the laws is not one of equality of operation or application to all citizens of the State or nation, but rather one of equality of operation or applicability within the particular class affected, which classification must, of course, be reasonable."

6 MLP, Constitutional Law, § 202, pp 157, 158, sets forth the following rule:

"Accordingly, equal protection of the laws does not prevent, and is not violated by, a reasonable classification by legislative enactment, if it applies alike to all persons within such class and reasonable grounds exist for making a distinction between those who fall within such class and those who do not."

This rule has been followed by our Court in *Little* v. *American State Bank of Dearborn,* 263 Mich 645; *In re Phillips,* 305 Mich 636; *Tribbett* v. *Village of Marcellus,* 294 Mich 607; *Godsol* v. *Michigan Unemployment Compensation Commission,* 302 Mich 652 (142 ALR 910).

The rule with respect to what type of classification is permissible was discussed in the case of *People* v. *Hall,* 290 Mich 15, and in *Kelley* v. *Judge of Re-*

*corder's Court of Detroit,* 239 Mich 204, where this Court said (p 214):

"The fundamental rule of classification is that it shall not be arbitrary, must be based on substantial distinctions and be germane to the purpose of the law."

The defendants have no quarrel with this rule of law, and admit that it has been the law in this State and the law as defined by the supreme court of the United States for a great many years. The controlling case in Michigan is *Haynes* v. *Lapeer Circuit Judge,* 201 Mich 138 (LRA1918D, 233). In this case the Court considered the constitutionality of a legislative act,[11] the title of which read as follows:

"An act to authorize the sterilization of mentally defective persons maintained wholly or in part by public expense in public institutions in this State and to provide a penalty for the unauthorized use of the operations provided for."

Briefly summarized this act authorized the management of any publicly maintained institution of the State, authorized to hold in custody individuals who had been adjudged by a court of competent jurisdiction mentally defective or insane, to render incapable of procreation, by the operations mentioned, inmates determined to be the proper subjects for such treatment. The State boards, physicians and surgeons in charge of the institutions were charged with authority to examine such inmates and to determine the advisability of such operation upon them. Notice was to be given to parents or guardians, and, if they objected, the matter was to be referred to the probate court of the county in which the institution was located. The probate court was then authorized to determine the question of sanity and the neces-

---

[11] PA 1913, No 34.

sity of the operation. Such a petition was filed in the probate court of Lapeer county for performing such an operation upon one of the female patients. The probate judge entered an order denying the petition. The medical superintendent sought a writ of mandamus to compel the Lapeer circuit judge to vacate the order of the probate judge denying the petition. The order to show cause raises the question of class legislation and the deprivation of the rights of the citizens guaranteed under the equal protection clauses of the Constitution of the United States and the Constitution of the State of Michigan. The circuit judge held, and was affirmed by this Court, that in the enactment of this legislation, the legislature had selected out of what might be termed a class of mentally defective persons only those already under public restraint, leaving immune from its operation all others of like kind to whom the reason for the legislative remedy is normally and equally, at least, applicable. Extending immunities and privileges to one part of a group which are denied to the remaining part is invalid class legislation. This Court said in affirmance (p 145):

"We are constrained to concur in the opinion of the learned circuit judge that this law as framed does not afford, in its scope, those affected by it that equal protection under the laws guaranteed by the Constitution, and so limits the class of defectives covered by its provisions as to be clearly class legislation without substantial distinction within constitutional inhibition."

The legislature again by PA 1923, No 285, attempted to provide for sterilization of feeble-minded persons who are unable to support any children they might have, and whose children probably would become public charges. The evident purpose of the legislature enacting this provision was to prevent the public from being required to support the chil-

dren of mentally defective persons. A petition was filed in the Wayne county probate court to sterilize a 16-year-old boy who had been duly adjudged to be feeble-minded by the probate court of Wayne county and was confined in the State home at Lapeer. The proceedings resulted in an order by the court appointing a physician to treat the boy by X-ray or vasectomy in order to render him incapable of procreation. The guardian *ad litem* for the boy sought a reversal of this order and brought certiorari to this Court. Judge McDONALD, speaking for the Court, in *Smith v. Wayne Probate Judge,* 231 Mich 409 (40 ALR 515), said (pp 420, 421):

"The evident purpose of the legislature  *  *  * was to protect the public from being required to support the children of mentally defective persons. In attempting to do so, an element inconsistent with the beneficial purpose of the statute was introduced. It is not germane to the object of the enactment as expressed in its title. It carves a class out of a class. In that it does not apply to those of the class who may be financially able to support their children, it is not made applicable alike to all members of the class. We think that it is subject to the constitutional objection discussed  *  *  *  in *Haynes* v. *Lapeer Circuit Judge, supra,* and  *  *  *  in *Peninsular Stove Co.* v. *Burton,* 220 Mich 284."

The Court proceeded to hold this provision of the statute unconstitutional in that it violated the equal protection clause of the Fourteenth Amendment to the United States Constitution and the similar provisions of the Michigan Constitution in failing to treat all within the class in the same manner.

This rule has been followed by this Court numerous times, as evidenced by the following cases: *Davidow* v. *Wadsworth Manfg. Co.,* 211 Mich 90, 96 (12 ALR 605); *In re Brewster Street Housing*

*Site,* 291 Mich 313, 339; *People* v. *Chapman,* 301 Mich 584, 597; *Burgess* v. *City of Detroit,* 359 Mich 269.

Turning to decisions of the United States supreme court, in *Truax* v. *Corrigan,* 257 US 312 (42 S Ct 124, 66 L ed 254, 27 ALR 375), the court said (pp 332, 333):

"Our whole system of law is predicated on the general, fundamental principle of equality of application of the law. 'All men are equal before the law,' 'This is a government of laws and not of men,' 'No man is above the law,' are all maxims showing the spirit in which legislatures, executives, and courts are expected to make, execute, and apply laws. But the framers and adopters of this amendment were not content to depend on a mere minimum secured by the due process clause, or upon the spirit of equality which might not be insisted on by local public opinion. They therefore embodied that spirit in a specific guaranty.

"The guaranty was aimed at undue favor and individual or class privilege, on the one hand, and at hostile discrimination or the oppression of inequality, on the other. It sought an equality of treatment of all persons, even though all enjoyed the protection of due process. Mr. Justice Field, delivering the opinion of this Court in *Barbier* v. *Connolly,* 113 US 27, 32 (5 S Ct 357, 28 L ed 923), of the equality clause, said—'Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment.' In *Hayes* v. *Missouri,* 120 US 68 (7 S Ct 350, 30 L ed 578), the court speaking through the same justice said the Fourteenth Amendment 'does not prohibit legislation which is limited either in the objects to which it is directed, or by the territory within which it is to operate. It merely requires that all persons subjected to such legislation shall be treated

alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed.' Thus the guaranty was intended to secure equality of protection not only for all but against all similarly situated. Indeed, protection is not protection unless it does so. Immunity granted to a class, however limited, having the effect to deprive another class, however limited, of a personal or property right, is just as clearly a denial of equal protection of the laws to the latter class as if the immunity were in favor of, or the deprivation of right permitted worked against, a larger class.

"Mr. Justice Matthews, in *Yick Wo* v. *Hopkins,* 118 US 356, 369 (6 S Ct 1064, 30 L ed 220), speaking for the court of both the due process and the equality clause of the Fourteenth Amendment, said:

" 'These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; *and the equal protection of the laws is a pledge of the protection of equal laws.' "*

The court went on to say (pp 337, 338):

"Classification must be reasonable. As was said in *Gulf, Colorado & Santa Fe R. Co.* v. *Ellis,* 165 US 150, 155 (17 S Ct 255, 41 L ed 666), classification 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without such basis.' As was said in *Magoun* v. *Illinois Trust & Savings Bank,* 170 US 283, 293 (18 S Ct 594, 42 L ed 1037): 'The rule [*i.e.,* of the equality clause] is not a substitute for municipal law; it only prescribes that that law have the attribute of equality of operation, and equality of operation does not mean indiscriminate operation on persons merely as such, but on persons according to their relations.' The same principle is repeated and enforced in *Southern R. Co.* v. *Greene,* 216 US 400, 417 (30 S Ct 287, 54 L ed 536): 'While reason-

able classification is permitted, without doing violence to the equal protection of the laws, such classification must be based upon some real and substantial distinction, bearing a reasonable and just relation to the things in respect to which such classification is imposed; and classification cannot be arbitrarily made without any substantial basis.' Classification is the most inveterate of our reasoning processes. We can scarcely think or speak without consciously or unconsciously exercising it. It must therefore obtain in and determine legislation; but it must regard real resemblances and real differences between things, and persons, and class them in accordance with their pertinence to the purpose in hand. Classification like the one with which we are here dealing is said to be the development of the philosophic thought of the world and is opening the door to legalized experiment. When fundamental rights are thus attempted to be taken away, however, we may well subject such experiment to attentive judgment. The Constitution was intended, its very purpose was, to prevent experimentation with the fundamental rights of the individual. We said through Mr. Justice Brewer, in *Muller* v. *Oregon,* 208 US 412, 420 (28 S Ct 324, 52 L ed 551, 13 Ann Cas 957), that 'it is the peculiar value of a written constitution that it places in unchanging form limitations upon legislative action, and thus gives a permanence and stability to popular government which otherwise would be lacking.' "

The court also stated (pp 329, 330):

"It is true that no one has a vested right in any particular rule of the common law, but it is also true that the legislative power of a State can only be exerted in subordination to the fundamental principles of right and justice which the guaranty of due process in the Fourteenth Amendment is intended to preserve, and that a purely arbitrary or capricious exercise of that power whereby a wrongful and highly injurious invasion of property rights, as here, is practically sanctioned and the owner stripped

of all real remedy, is wholly at variance with those principles."

In the case of *Skinner* v. *Oklahoma,* 316 US 535 (62 S Ct 1110, 86 L ed 1655), dealing with a sterilization statute from Oklahoma, the United States supreme court had this to say (p 541) :

"The guaranty of 'equal protection of the laws is a pledge of the protection of equal laws.' *Yick Wo* v. *Hopkins,* 118 US 356, 369. When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment. *Yick Wo* v. *Hopkins, supra; Missouri, ex rel. Gaines,* v. *Canada,* 305 US 337 (59 S Ct 232, 83 L ed 208)."

The court in this case, having reference to *Smith* v. *Wayne Probate Judge,* 231 Mich 409 (40 ALR 515), said (316 US 542) :

"The equal protection clause would indeed be a formula of empty words if such conspicuously artificial lines could be drawn."

In *Hartford Steam Boiler Ins. Co.* v. *Harrison,* 301 US 459 (57 S Ct 838, 81 L ed 1223), in which the court held a Georgia statute in violation of the equal protection clause of the Federal Constitution, Mr. Justice McReynolds, speaking for the court, said (pp 461, 462) :

"The applicable principle in respect of classification has often been announced. It will suffice to quote a paragraph from *Louisville Gas & Electric Co.* v. *Coleman,* 277 US 32, 37, 38 (48 S Ct 423, 72 L ed 770).

" 'It may be said generally that the equal protection clause means that the rights of all persons must rest upon the same rule under similar circumstances, *Kentucky Railroad Tax Cases,* 115 US 321, 337 (6 S Ct 57, 29 L ed 414) ; *Magoun* v. *Illinois Trust &*

*Savings Bank,* 170 US 283, 293 (18 S Ct 594, 42 L ed 1037), and that it applies to the exercise of all the powers of the State which can affect the individual or his property, including the power of taxation. *County of Santa Clara* v. *Southern Pac. R. Co.* (Cal), 18 F 385, 388–399; *Railroad Tax Cases* (Cal), 13 F 722, 733. It does not, however, forbid classification; and the power of the State to classify for purposes of taxation is of wide range and flexibility, provided always, that the classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co.* v. *Virginia,* 253 US 412, 415 (40 S Ct 560, 64 L ed 989) ; *Air-Way Corp.* v. *Day,* 266 US 71, 85 (45 S Ct 12, 69 L ed 169) ; *Schlesinger* v. *Wisconsin,* 270 US 230, 240 (46 S Ct 260, 70 L ed 557, 43 ALR 1224). That is to say, *mere* difference is not enough: the attempted classification "must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis." *Gulf, C. & S. F. R. Co.* v. *Ellis,* 165 US 150, 155 (17 S Ct 255, 41 L ed 666). Discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision. Compare *Martin* v. *District of Columbia,* 205 US 135, 139 (27 S Ct 440, 51 L ed 743) ; *Bell's Gap R. Co.* v. *Pennsylvania,* 134 US 232, 237 (10 S Ct 533, 33 L ed 892).'

"Despite the broad range of the State's discretion, it has a limit which must be maintained if the constitutional safeguard is not to be overthrown. Discriminations are not to be supported by mere fanciful conjecture. *Borden's Farm Products Co.* v. *Baldwin,* 293 US 194, 209 (55 S Ct 187, 79 L ed 281). They cannot stand as reasonable if they offend the plain standards of common sense."

In the case of *Snowden* v. *Hughes,* 321 US 1 (64 S Ct 397, 88 L ed 497), the court wrote (p 11):

"Where discrimination is sufficiently shown, the right to relief under the equal protection clause is not diminished by the fact that the discrimination relates to political rights. *McPherson* v. *Blacker,* 146 US 1, 23, 24 (13 S Ct 3, 36 L ed 869); *Nixon* v. *Herndon,* 273 US 536, 538 (47 S Ct 446, 71 L ed 759); *Nixon* v. *Condon,* 286 US 73 (52 S Ct 484, 76 L ed 984, 88 ALR 458); see *Pope* v. *Williams,* 193 US 621 (24 S Ct 573, 48 L ed 817)."

In *Southern R. Co.* v. *Greene,* 216 US 400 (30 S Ct 287, 54 L ed 536), Mr. Justice Day, speaking for the court, said (pp 412, 413):

"The Federal Constitution, it is only elementary to say, is the supreme law of the land, and all its applicable provisions are binding upon all within the territory of the United States. Whenever its protection is invoked the courts of the United States, both State and Federal, are bound to see that rights guaranteed by the Federal Constitution are not violated by legislation of the State. One of the provisions of the Fourteenth Amendment thus binding upon every State of the Federal Union prevents any State from denying to any person or persons within its jurisdiction the equal protection of the laws. * * *

"The equal protection of the laws means subjection to equal laws, applying alike to all in the same situation. If the plaintiff is a person within the jurisdiction of the State of Alabama within the meaning of the Fourteenth Amendment, it is entitled to stand before the law upon equal terms, to enjoy the same rights as belong to, and to bear the same burdens as are imposed upon, other persons in a like situation. * * *

" 'The inhibition of the amendment that no State shall deprive any person within its jurisdiction of the equal protection of the laws was designed to prevent any person or class of persons from being

singled out as a special subject for discriminating and hostile legislation.' "

Similarly, in the case of *Smith* v. *Cahoon,* 283 US 553 (51 S Ct 582, 75 L ed 1264), the court, in striking down a Florida statute which on its face made no distinction between a common carrier and a private carrier, said (pp 566, 567):

"But the constitutional guaranty of equal protection of the laws is interposed against discriminations that are entirely arbitrary. In determining what is within the range of discretion and what is arbitrary, regard must be had to the particular subject of the State's action. * * * So far as the statute was designed to safeguard the public with respect to the use of the highways, we think that the discrimination it makes between the private carriers which are relieved of the necessity of obtaining certificates and giving security, and a carrier such as the appellant, was wholly arbitrary and constituted a violation of the appellant's constitutional right. 'Such a classification is not based on anything having relation to the purpose for which it is made.' *Air-Way Corp.* v. *Day,* 266 US 71, 85 (45 S Ct 12, 69 L ed 169); *Connolly* v. *Union Sewer Pipe Co.,* 184 US 540, 563, 564 (22 S Ct 431, 46 L ed 679); *Southern R. Co.* v. *Greene,* 216 US 400, 417 (30 S Ct 287, 54 L ed 536); *Truax* v. *Corrigan,* 257 US 312, 332, 333 (42 S Ct 124, 66 L ed 254, 27 ALR 375); *Louisville Gas & Electric Co.* v. *Coleman,* 277 US 32, 37 (48 S Ct 423, 72 L ed 770)."

In a United States supreme court case decided September 12, 1958, *Cooper* v. *Aaron,* 358 US 1 (78 S Ct 1399, 78 S Ct 1401, 3 L ed 2d 3, 3 L ed 2d 5, 3 L ed 2d 19), the supreme court, speaking with reference to the integration of public schools in Little Rock, Arkansas, said (pp 17–19):

" 'Whoever, by virtue of public position under a State government, * * * denies or takes away

the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State.   This must be so, or the constitutional prohibition has no meaning.'   *Ex parte Virginia,* 100 US 339, 347 (25 L ed 676).   Thus the prohibitions of the Fourteenth Amendment extend to all action of the State denying equal protection of the laws; whatever the agency of the State taking the action, see *Virginia* v. *Rives,* 100 US 313 (25 L ed 667); *Pennsylvania* v. *Board of Directors of City Trusts of Philadelphia,* 353 US 230 (77 S Ct 806, 1 L ed 2d 792); *Shelley* v. *Kraemer,* 334 US 1 (68 S Ct 836, 92 L ed 1161, 3 ALR2d 441); or whatever the guise in which it is taken, see *Derrington* v. *Plummer* (CCA 5), 240 F2d 922; *Department of Conservation and Development* v. *Tate* (CCA 4), 231 F2d 615.   In short, the constitutional rights of children not to be discriminated against in school admission on grounds of race or color declared by this court in the *Brown Case* [*Brown* v. *Board of Education of Topeka,* 347 US 483 (74 S Ct 686, 98 L ed 873, 38 ALR2d 1180), 349 US 294 (75 S Ct 753, 99 L ed 1083)], can neither be nullified openly and directly by State legislators or State executive or judicial officers, nor nullified indirectly by them through evasive schemes for segregation whether attempted 'ingeniously or ingenuously.'   *Smith* v. *Texas,* 311 US 128, 132 (61 S Ct 164, 85 L ed 84).

"What has been said, in the light of the facts developed, is enough to dispose of the case.   However, we should answer the premise of the actions of the governor and legislature that they are not bound by our holding in the *Brown Case.*   It is necessary only to recall some basic constitutional propositions which are settled doctrine.

"Article 6 of the Constitution makes the Constitution the 'supreme law of the land.'   In 1803, Chief Justice Marshall, speaking for a unanimous court, referring to the Constitution as 'the fundamental and paramount law of the Nation,' declared in the

notable case of *Marbury* v. *Madison,* 1 Cranch (5 US) 137, 177 (2 L ed 60), that 'It is emphatically the province and duty of the judicial department to say what the law is.'   *   *   *   It follows that the interpretation of the Fourteenth Amendment enunciated by this court in the *Brown Case* is the supreme law of the land, and article 6 of the Constitution makes it of binding effect on the States 'anything in the Constitution or laws of any State to the contrary notwithstanding.'   *   *   *

"No State legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it.   Chief Justice Marshall spoke for a unanimous court in saying that: 'If the legislatures of the several States may, at will, annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments, the Constitution itself becomes a solemn mockery.'   *United States* v. *Peters,* 5 Cranch (9 US), 115, 136 (3 L ed 53).   A governor who asserts a power to nullify a Federal court order is similarly restrained.   If he had such power, said Chief Justice Hughes, in 1932, also for a unanimous court, 'it is manifest that the fiat of a State governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of State power would be but impotent phrases.'   *Sterling* v. *Constantin,* 287 US 378, 397, 398 (53 S Ct 190, 77 L ed 375)."

Again in *Hernandez* v. *Texas,* 347 US 475 (74 S Ct 667, 98 L ed 866), the court, dealing with a systematic exclusion of persons of Mexican descent from service as jury commissioners, said (p 478):

"When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated.   The Fourteenth Amendment is not

directed solely against discrimination due to a 'two-class theory'—that is, based upon differences between 'white' and Negro."

Again in *Phillips Chemical Co.* v. *Dumas Independent School District,* 361 US 376 (80 S Ct 474, 4 L ed 2d 384), the court said (p 385):

"The State's power to classify is, indeed, extremely broad, and its discretion is limited only by constitutional rights and by the doctrine that a classification may not be palpably arbitrary."

The question then is: Does disposition of Proposition No 3 constitute equality of operation or applicability within the class affected? The defendants argue that it does, since every citizen within a particular senatorial district has an equal right to cast a vote for a senator with all other citizens within the same senatorial district. Is this the test? Clearly, it is not. The test is found in the determination of the class. The class is those voting within the State of Michigan for the office of State senator. Therefore, the test would be: Has each citizen voting for State senator in the State of Michigan the right to cast a vote for State senator equal with that of all other citizens? If they do not, and I think it is agreed they do not, then clearly all within the same classification have not been treated equally. This alone, however, under the law would not necessarily declare the amendment in violation of the due process clause. There is another factor which has to be considered, and that is: Is this discrimination palpably arbitrary and unreasonable? Is there any reasonable criterion set up to determine the area districts spelled out in the amendment? In examining this situation, we find that they certainly are not alike so far as population is concerned. When it comes to the question of area, admittedly there is no resemblance between districts. Certainly, it is

not a similarity of interests, since there is a substantial distinction between districts which are located side by side insofar as population and area are concerned, even though they have common regional characteristics and interests.

I have searched in vain in the briefs for, and the oral arguments have failed to submit, any reasonable or rational classification or criterion upon which the existing constitutional amendment could be upheld. In oral arguments before the Court it was admitted by both sides that no such criterion existed. In fact, it was argued by the defendants that none was needed—that the people had a right to make any kind of classification they desired, rational or otherwise. It appears from the record, and is a matter of common knowledge, that gross population inequality exists among the senatorial districts. In short, there is no rational correlation in the present senatorial districts as set forth in the 1952 amendment between representation of area, political units, interests, population, or any combination of these. How then were the lines drawn for the present amendment? The answer is very simple, and one that is known to every school boy and girl in the State of Michigan, and one of which certainly this Court can take judicial notice. It was done for the arbitrary and intentional purpose of maintaining the control of the State legislative government in the hands of a relatively few people. Prior to 1952, the legislature, which had the responsibility for reapportioning the Michigan senate according to population,[12] failed to

---

[12] "The senate shall consist of 32 members. Senators shall be elected for 2 years and by single districts. Such districts shall be numbered from 1 to 32, inclusive, each of which shall choose 1 senator. No county shall be divided in the formation of senatorial districts, unless such county shall be equitably entitled to 2 or more senators." Michigan Constitution (1908), art 5, § 2, prior to 1952 amendment.

"At the session in 1913, and each tenth year thereafter, the legislature shall by law rearrange the senatorial districts and apportion anew the representatives among the counties and districts

carry out its constitutional obligation and duty from the year 1925 to 1952. The legislature, in so violating the constitutional mandate, created districts which gave it in 1952 the kind of control it wanted. Proposition No 3, the 1952 amendment, was designed and admittedly promoted for the very purpose of freezing the existing districts so this control could be perpetuated. This we find as a fact.

If we project into the future even such a short time as 1970, we will find that an even smaller minority of people will be governing Michigan. The unrepresentative senate would be able to veto any legislation, progressive or otherwise, to the eventual downfall of Michigan itself.

The only designations that can be given the 1952 amendment are palpably arbitrary, discriminatory, and unreasonable, and as such it is class legislation which deprives plaintiff and other citizens of Michigan of their rights in violation of the Fourteenth Amendment to the United States Constitution.

Two questions were asked by the Court. Both involved questions of violation of our State Constitution. Both were procedural questions. We find the 1952 amendment void in that it denies plaintiff and other citizens of Michigan equal protection of the laws contrary to the Fourteenth Amendment to the United States Constitution, and we find no valid senate apportioning or districting act in existence in pursuance of the Michigan Constitution (1908), art 5, §§ 2 and 4, as unamended. We need not discuss any of the State questions.

Writ of mandamus should issue out of and under the seal of this Court, commanding the defendant

according to the number of inhabitants, using as the basis for such apportionment the last preceding United States census of this State. Each apportionment so made, and the division of any county into representative districts by its board of supervisors, made thereunder, shall not be altered until the tenth year thereafter." Michigan Constitution (1908), art 5, § 4, prior to 1952 amendment.

secretary of State not to issue 1960 election notices for State senators, nor to otherwise perform those acts requisite to the holding of elections for State senators according to the districts prescribed by the Michigan Constitution (1908), art 5, §§ 2 and 4, as colorably amended by Proposition No 3 of the general election of November, 1952, and by PA 1953, No 77,[13] adopted pursuant thereto, until such time as the Michigan legislature enacts valid legislation reapportioning the State senatorial districts in accordance with the Michigan Constitution (1908), §§ 2 and 4, as unamended, and the last Federal decennial census.

Jurisdiction of this cause should be retained by this Court pending an opportunity for the enactment of timely, valid reapportionment legislation by the present Michigan legislature. If the legislature fails to so act within 60 days from the date of the filing of this opinion, the defendant secretary of State should be directed to petition this Court for further instructions. Plaintiff and other parties may so petition if they desire.

A public question being involved, no costs are allowed.

SMITH, J. (*dissenting*). This case involves the citizens' right to vote. It involves, as well, their right to equality of representation in their legislature, "a right inestimable to them and formidable to tyrants only."[1]

We have before us a petition for an original writ of mandamus directed to the defendant, the secretary of State. Through such writ the plaintiff seeks to prohibit the defendant from conducting the forthcoming State senatorial elections in accordance with

[13] CLS 1956, §§ 4.601, 4.602 (Stat Ann 1959 Cum Supp §§ 2.27[1], 2.27[2]).
[1] Declaration of Independence.

the present system of senatorial districting. That system is prescribed in section 2 of article 5 of the Constitution of 1908, as amended at the general election of November 4, 1952. The present system, enacted in the 1952 amendment, briefly, establishes senatorial districts, territorially described, in the Constitution. (The senatorial districts, until 1952, had been established by the legislature under the constitutional mandate of representation by population.)

The basis for the plaintiff's petition is simply that this amendment to the Michigan Constitution is violative of the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution. The violation of the United States Constitution asserted is the establishment of the senatorial districts by a classification of the citizens into groups lacking any reasonable explanation, arbitrary, capricious, and unreasonable classifications. It is urged that the establishment of the districts is thus unreasonable because there is no rational, or, indeed, discernible, basis for the districts prescribed in the amendment, that they are, in fact, no more than arbitrary allotments of territory.

It should be noted at the outset that this is not an "apportionment" case.[2] To so describe it will only inject confusion into the fundamentally simple issue before the court. We will, it is true, advert to cases wherein malapportionment had become sufficiently serious to warrant court action, or attempted self-help by the citizenry,[3] but only to the degree neces-

[2] "In some States a distinction may be made between reapportionment, the allotment to each county of its quota of representatives, determined by the legislature, and redistricting, the rearrangement of the boundaries of legislative districts performed by local agencies. In most cases, however, the existence of single member districts makes the distinction unnecessary." Walter, Reapportionment of State Legislative Districts, 37 Ill L Rev 20, 21.

[3] "John W. Keogh, unsuccessful plaintiff in a previous apportionment suit was defending a foreclosure suit. Representing himself, he

sary to point out their differences. We are not, then, directly concerned with the cases wherein the chosen basis for representation, *e.g.*, population, has become distorted through shifts in the population, and its centers, and through the cooperation of an inactive legislature. The insidious character of this type of "silent gerrymander" has been fully exposed,[4] but suffice for the moment to stress that it is not the case before us, though related thereto. Thus cases in which aggrieved citizens seek to compel, directly or indirectly, the legislature to perform its constitutional duty of reapportionment on the prescribed basis are not squarely in point.[5] We are not asked

argued that the Illinois courts were acting illegally since the legislature had failed to redistrict. When the judge tried to stop the argument, Keogh pulled a gun. The opposing lawyer was shot and killed as he tried to get the gun away. Keogh explained that he killed the lawyer 'to bring forcibly to public attention his contention that the supreme court of Illinois was an illegal body because of failure to reapportion legislative districts.' " Lewis, Legislative Apportionment and the Federal Courts, 71 Harv L Rev 1057, n 77.

[4] "State constitutional provisions with respect to legislative reapportionment are more honored in their breach than in their observance. This is a rather curious phenomenon in a country which has placed so much store by written constitutions as the *sine qua non* of popular sovereignty and the rule of law." Short, States That Have Not Met Their Constitutional Requirements, 17 Law & Contemp Prob 377.

See, generally, Symposium on Legislative Reapportionment, 17 Law & Contemp Prob 253; Lewis, Legislative Apportionment and the Federal Courts, 71 Harv L Rev 1057; Walter, Reapportionment of State Legislative Districts, 37 Ill L Rev 20; Durfee, Apportionment Representation in the Legislature, 43 Mich L Rev 1091; Tabor, The Gerrymandering of State and Federal Legislative Districts, 16 Md L Rev 277; Court Review of Congressional Apportionment, 3 Stan L Rev 129; 62 Harv L Rev 659; 58 Columbia L Rev 1080; 43 Ill L Rev 180; 17 La L Rev 593; Comment, 1955 Wis L Rev 125; Comment, 1949 Wis L Rev 761; 56 Yale LJ 127; 18 Temp LQ 388.

Also of interest, Farmer, Legislative Process in Alabama, pp 20–43; Ahl, Reapportionment in California, 22 Am Pol Sci Rev 977–980; Mott, Reapportionment in Illinois, 21 Am Pol Sci Rev 598–602; Stewart, A Study in Gerrymandering in Kentucky, 22 Ky LJ 417, 426; Apportionment of the New York State Assembly, 29 St. John's L Rev 345; Korsak & Di Salle, Legislative Apportionment in Pennsylvania, 12 U Pitt L Rev 215, 222–243.

[5] *E.g., Colegrove v. Green*, 328 US 549 (66 S Ct 1198, 90 L ed 1432); *Kidd v. McCanless*, 352 US 920 (77 S Ct 223, 1 L ed 2d 157).

so to do.  These cases have their own unique problems[6] which are not presented to us.

What we are asked to do, basically, is to rule upon the validity of a State constitutional amendment. The case before us is without applicable precedent upon its own peculiar facts.  Closest to it, yet somewhat removed, both factually and legally, is the situation in which a citizen seeks to test the constitutional validity of a recently enacted law apportioning the State on a chosen basis.  The ground of attack often made in such situation is that the law does not conform to the State Constitution and is, therefore, invalid.  The infirmity in the legislation may consist in a lack of practical equality of population in the districts despite a constitutional requirement that legislative districts be as nearly equal as practicable in population.  The invalidity may be irregularly and unreasonably shaped districts (gerrymandered) in the teeth of a constitutional provision that districts be convenient and contiguous.  Such in-

---

6 No fully comparable instance of this situation can be found in Anglo-American law—one party, who is actually an interested litigant, being also the judge and jury.  The judgment that there is or is not to be an apportionment is left to those who will be immediately (but not as vitally as the voters) affected.

The States have been slow to act in this area.  Certain States, including the 2 recent States, Hawaii and Alaska, have adopted constitutional provisions to take the responsibility for apportionment away from the political branch.  Such States are:  California, Illinois, South Dakota, Texas, where a special board is directed to reapportion if the legislature fails to do so within a specified time; Oregon, where the same power is given to the secretary of State; Arkansas, Ohio, and Missouri, where the power is given entirely to a board; and Arizona, where the secretary of State is given complete power.  In the constitutions of Alaska and Hawaii the governor is given the exclusive power to reapportion.

On this point generally, see Lewis, *op cit supra,* at 1089, 1090, nn 187–194.

Regarding the point here made, a comment by Mr. Justice Stone in *United States* v. *Carolene Products Co.,* 304 US 144, 152 (58 S Ct 778, 82 L ed 1234), note 4, is worthy of reference:

"It is unnecessary to consider now whether legislation which restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation, is to be subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment than are most other types of legislation."

validity may, as well, arise from the splitting of counties in the formation of legislative districts, under circumstances expressly forbidden by the Constitution, and it may even reach the extreme of providing for representatives and senators in excess of the number specified in the Constitution.

This case is not any of these. We have mentioned them merely to keep the issue before us clearly in focus. Their similarities arise from the fact that in each a statute is weighed against the charge that it is in palpable violation of superior authority, namely, the Constitution of the State. So, here, the appeal is made to an authority higher than the State Constitution here involved, *i.e.,* to the Federal Constitution. The "supreme Law of the Land" is not the Constitution of the State of Michigan, or that of any other State, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding," but the Constitution of the United States, and we, "the Judges in every State shall be bound thereby."[7]

Despite, then, their differences, through each runs a thread in the fabric of the fundamental right to vote. They provide for us basic principles which will contribute to our solution. We will from time to time refer to them, and we will draw also upon that landmark series of cases, emanating from the Federal courts, which have sought to preserve to the Negro that most precious of all rights in a democratic society.

In order that this situation may be seen in its proper constitutional perspective, it is necessary to set forth in some detail not only the facts pleaded by the parties, but also certain historical matters alluded to in the briefs and appendices.

Prior to the adoption of the amendment now under scrutiny, the Michigan senate consisted of 32 sena-

---

[7] US Const, art 6, § 2.

tors, each elected by a single district.   Beginning in 1913, and each 10th year thereafter, the Constitution of 1908 directed that:

"the legislature shall by law *rearrange the senatorial districts* and apportion anew the representatives among the counties and districts *according to the number of inhabitants,* using as the basis for such apportionment the last preceding United States census of this State."   (Emphasis supplied.)   Art 5, § 4, Const 1908.

The last apportionment of the legislature occurred in 1925, relying in the main upon the 1920 census.[8]

By 1950 this representative system in the Michigan senate, constitutionally directed to be decennially apportioned on a population basis, had become distorted due to growth in the population and shifts in the centers thereof, combined with a total failure of the legislature to obey the constitutional mandate to reapportion on the chosen basis of population. According to the 1950 census figures, the largest senatorial district contained 544,564 people, while the smallest contained only 61,008.   Thus, the smallest district, the thirty-second, was given through lapse of time and lack of legislative action, an equal voice with that of the largest, the eighteenth district.   To indicate the extreme disparity in population among the districts, only a few of the most glaring variances in the ratio of population of this smallest district to the other more populated areas need be cited in the following table:

----

[8] PA 1925, No 291 (CL 1948, § 4.1 [Stat Ann 1952 Rev § 2.1]).

## TABLE 1[9]

*Population of senatorial districts prior to
the amendment of 1952.*

| District | Counties | Population in 1950 | Ratio of District to Smallest |
|---|---|---|---|
| 18 | Part of Wayne | 544,564 | 8.9 to 1 |
| 12 | Oakland, Washtenaw | 530,607 | 8.7 to 1 |
| 21 | Part of Wayne | 525,955 | 8.6 to 1 |
| 1 | Part of Wayne | 475,753 | 7.8 to 1 |
| 11 | Macomb, Lapeer, Saint Clair | 312,354 | 5.1 to 1 |
| 5 | Part of Wayne | 282,247 | 4.6 to 1 |
| 13 | Genesee | 270,963 | 4.5 to 1 |
| 2 | Part of Wayne | 270,255 | 4.4 to 1 |
| 32 | Baraga, Houghton, Keweenaw, Ontonagon | 61,008 | 1 to 1 |

The "silent gerrymander" had thus clearly reached proportions offensive even to the most timid. The voice of one citizen was nearly 9 times as influential as another's in charting the course of government in this State.

The malapportioned districts noted in the table, we observe, were only the most flagrant examples. The remainder, as well, were malapportioned and to a degree only somewhat less gross. In these enumerated districts, particularly, the citizen was told that although he might have a senatorial representative, that representative would speak for many times as many voters as his co-senator from one of the favored areas, but he would speak no louder. The votes of 9 citizens in Oakland and Washtenaw counties, or parts of Wayne county, were worth no more than, approximately, that of 1 citizen in Baraga, Houghton, Keweenaw, and Ontonagon counties. The distortion in the structure of our government ranged downward from this extreme, as table 1 indicates.

Under the 1952 amendment to article 5 of the Constitution, the number of senators was increased to 34. Each member is now elected from a district

[9] See plaintiff's exhibit D.

which is geographically described in the amendment.[10] The boundaries so set are not subject to change because of fluctuation in the population. In fact, they may not be changed except by constitutional amendment. The new districts of the senate as established in this amendment are identical with the old districts, with 2 exceptions.[11]

If the basis of the representative scheme in this amendment were population, then the division of the State into 34 chosen districts would be grossly unfair, as a reference to table 2 clearly indicates:

TABLE 2[12]

*Population ratios under constitutional amendment of 1952.*

| District | Counties | Population in 1950 | Ratio of this district to the smallest |
|---|---|---|---|
| 13 | Genesee | 270,963 | 4.5 to 1 |
| 11 | Macomb | 184,961 | 3.0 to 1 |
| 18 | Part of Wayne | 333,498 | 5.5 to 1 |
| 2 | Part of Wayne | 340,738 | 5.6 to 1 |
| 1 | Part of Wayne | 344,136 | 5.6 to 1 |
| 5 | Part of Wayne | 344,986 | 5.6 to 1 |
| 21 | Part of Wayne | 352,890 | 5.8 to 1 |
| 3 | Part of Wayne | 354,961 | 5.8 to 1 |
| 4 | Part of Wayne | 364,026 | 6.0 to 1 |
| 12 | Oakland | 396,001 | 6.5 to 1 |
| 32 | Baraga, Houghton, Keweenaw, Ontonagon | 61,008 | 1 to 1 |
| *New Districts* | | | |
| 33 | Washtenaw | 134,606 | 2.2 to 1 |
| 34 | Lapeer, Saint Clair | 127,393 | 2.1 to 1 |

[10] Michigan Const (1908), art 5, § 2, as amended, provides:
"The senate shall consist of 34 members. Senators shall be elected for 2 years and by single districts. Such districts shall be numbered from 1 to 34, inclusive, and shall consist of the territory within the boundary lines of the counties existing at the time of the adoption of this amendment, as follows: First through fifth, eighteenth, twenty-first, Wayne county; nineteenth, Lenawee and Monroe counties;" et cetera.

[11] The eleventh district which prior to the amendment comprised Lapeer, Saint Clair, and Macomb counties was divided into 2 districts, the eleventh, Macomb county; and the thirty-fourth, Lapeer and Saint Clair counties.

The twelfth district, which formerly comprised Oakland and Washtenaw counties, was divided into the twelfth, Oakland county; and the thirty-third, Washtenaw county.

[12] See plaintiff's exhibit G, pt 1.

The smallest district is still the thirty-second and the largest, the twelfth, although the latter has been reduced in population, through the splitting of the 2 counties, to 396,001. The ratio of population of the district to the smallest is, nevertheless, 6.5 to 1. The change in ratio of the eleventh district to the smallest is now 3.0 to 1, although before it was 5.1 to 1. Within Wayne county the representation remained, upon the average, manifestly disproportionate. The plaintiff attacks this scheme as merely one of "constitutionalized malapportionment," violative of the Fourteenth Amendment. Defendants, however, argue that since this scheme of representation has been written into the Constitution, in place of our former scheme of representation based upon apportionment by population, it is valid.

There is no question but that, if this were attempted under the unamended provisions of article 5, the legislation would be unconstitutional as providing for obviously unfair and unrepresentative districts. and there is no question, moreover, that we would have entertained suit thereon. It is settled law in this jurisdiction that this Court neither hesitates to scrutinize apportionment acts for constitutionality nor to hold them invalid should their provisions offend our basic charter. *Board of Supervisors of Houghton County* v. *Secretary of State,* 92 Mich 638 (16 LRA 432); *Giddings* v. *Secretary of State,* 93 Mich 1 (16 LRA 402); *Williams* v. *Secretary of State,* 145 Mich 447. We have rejected as spurious the asserted validation of an unconstitutional apportionment arising from lapse of time or intervening elections conducted under it. Thus we held unconstitutional in *Board of Supervisors of Houghton County* v. *Secretary of State, supra,* an apportionment act of 7 years standing, including, as well, in our holding of invalidity, an intervening act, equally offensive to the requirement of our Constitution.

We stress our holdings in our cases last cited because they are grounded upon a principle not to be disputed, and dispositive of the case at bar. Our people have a right, inalienable and undisputed, to equality of representation. The right is not to be diluted or diverted. It will succumb neither to the chicanery of the crafty, nor to the apathy of those of our constitutional officers whose failure to act in accordance with its clear mandate accomplishes the "silent gerrymander." Nor, indeed, is the citizens' right vulnerable to the massive power of a majority which disenfranchises through nothing less than amendment of our Constitution itself. *Davis* v. *Schnell* (SD Ala), 81 F Supp 872, affirmed *per curiam* (1949), 336 US 933 (69 S Ct 749, 93 L ed 1093), *infra.*

They forget, those of the latter group, that our disenfranchised appeal not only to us but to a higher authority. Even with respect to rights reserved to the States, the laws of the individual States cannot supervene the Federal Constitution.

That a disenfranchisement is accomplished by a majority vote and sought to be made effective through constitutional amendment gives it no immunity from scrutiny. We would neither hold our tongue nor stay our hand if all the Negroes in our State were, by constitutional amendment, wholly disenfranchised, nor the white protestants, nor the Free Masons, nor any other group, and we see no difference between such deprivations and the case at bar, where those who have flooded into our vast industrial centers are given only a part of the vote given to citizens in other parts of the State.

In defense of what has been done it is urged that "area" has now become the basis of representation. It need not seriously be questioned that area has been, and may be, a factor in fashioning representative districts, but the real question the defendants

are putting in issue is whether the court must accept this scheme of representation as valid simply because it is labeled an "area form of representation," as though, *ipsis verbis,* such system must be valid.

The argument made necessarily involves the basic theory of apportionment, any apportionment. In the history of representative government and man's search for a "democratic society," various forms of representation have been utilized. In each there is a "value," some basis for the scheme of representation. This gives substance to the classification employed, or, as is said in the law, roots them "in reason,"[13] the distinctions made having "some relevance to the purpose for which the classification is made."[14] Various devices have been employed. Popular for a time was the "functional division" of the population into groups sharing the same social and economic interests. Thus in South Carolina, from 1808 to the Civil War, one means of making this division was the amount of taxes paid. To the present day, in fact, the determining factor in apportionment of the senate of New Hampshire is the amount of direct taxes paid.[15] In Europe, groupings of voters have been based upon such factors as nationality, profession, university affiliation, and occupation, *e.g.,* factory employment.

In this case we are told that classification is grounded upon area. But, so far as area alone is concerned, we see[16] that the twelfth district, comprising only 1 county, is 233 square miles larger than the thirteenth district, also comprising only 1 county, but it has 6,955 square miles less territory than the thirtieth district, which encompasses some 7 coun-

---

13 *Griffin* v. *Illinois,* 351 US 12, 21 (concurring opinion) (76 S Ct 585, 100 L ed 891, 55 ALR2d 1055).
14 *Walters* v. *City of St. Louis,* 347 US 231, 237 (74 S Ct 505, 98 L ed 660).
15 New Hampshire Const (1783), part 2, art 26.
16 Plaintiff's exhibit H.

ties. The thirtieth district, in turn, has 7,188 square miles more than the thirteenth district and approximately 7,401 square miles more territory than the sixteenth or seventeenth districts, which comprise Kent county. Thus, we discover 2 senators from Kent county each representing approximately 431 square miles, one senator from Oakland county representing 877 square miles, one senator from the twenty-eighth district (comprising 10 counties) representing 5,471 square miles, and the senator from the thirtieth district (7 counties) representing 7,832 square miles.

The "area" representation employed is, clearly, haphazard. Is there, in fact, a formula by which this result has been achieved? If so, it has not been revealed to us, either in the materials submitted by the parties, or the representations made upon oral argument, nor does our research reveal any clue. We conclude that as to area alone no recognizable (far less rational) criterion has been employed.

The possibility exists, of course, that it is area plus something else. In our own colonial times there was some districting according to governmental boundaries, such as towns and counties. The town unit of representation still exists in limited form in some areas. See *Opinions of Justices,* 101 NH 523 (132 A2d 411). As counsel for the defendants has so painstakingly set forth in his appendix, the county still forms the basis for representation in many State senates. In England this scheme, involving the corporate towns and boroughs, led to the infamous "rotten boroughs," and the resultant reforms.

The United States senate is still chosen on this basis, but, it will be observed, this is not the "area" form of representation that the defendants would argue. It is election through a system of apportionment upon governmental units. Area is involved only in the sense that any governmental unit occu-

pies some area, just, indeed, as does any human activity. The adoption of this form of representation for the United States senate was a compromise by the smaller colonies in return for giving up a part of their political sovereignty. We need not, however, develop the history of the selection of this form of representation for the United States senate, for the writers agree on the elementary point that it was adopted only when the Constitutional Convention was on the verge of collapse. The Federal Union was a union of people and sovereigns, each of whom was not willing to relinquish its sovereignty to a government chosen solely according to numbers. Thus, a senate elected by the States, through their legislatures, was the compromise. See, on this point particularly, the following: Lewis, Legislative Apportionment and the Federal Courts (1958), 71 Harv L Rev 1057, 1071; Harvey, Reapportionment of State Legislatures—Legal Requirements (1952), 17 Law & Contemp Prob 364, 365; de Grazia, General Theory of Apportionment (1952), 17 Law & Contemp Prob 256; Durfee, Apportionment of Representation in the Legislature (1945), 43 Mich L Rev 1091, 1095; Federalist Papers, No 62, as quoted in *MacDougall* v. *Green* (1948), 335 US 281, 289, 290 (69 S Ct 1, 93 L ed 3). This ultimate decision thus made has been well summarized in the statement that: " 'In *one* branch, the *people,* ought to be represented; in the *other,* the *States.*' " 1 Farrand, The Records of the Federal Convention (1787), p 462, quoted in Lewis, *op. cit., supra,* 1071, n 85.

It must be stressed that no effort was made by the Michigan amendment to apportion according to the existing political units, and thus we do not reach the question whether or not an historic political unit, once related to the life of the State on a realistic and rational basis, but now largely devoid of people, and representative only of cut-over and despoiled acreage, is a constitutional basis for representation.

The apportionment was not done with relation to counties, assuredly, since some counties comprise several districts, while others are combined to form one district. It has not been done with relation to townships, cities, villages, wards, precincts, or any other political unit. Area, then, is not related to any recognized political subdivision, either great or small, and thus falls defendants' arguments that invalidation of a constitutional amendment based solely, as here, upon arbitrary areas, will mean the invalidity of all classifications within our State based upon traditional political units, as well, inferentially, as those of other State constitutions based upon their selected political units.

We have postulated other criteria in an effort to ascertain whether there is any recognizable basis for the classification employed in the determination of the geographical areas, and whether such basis, if found, has any relevance to the electoral process. All have failed. There are obviously wide variances in the various senatorial districts, as to areas, as to the numbers of counties, as to urban populations, as to rural nonfarm populations, as to rural farm populations, as to commercial farms, and as to the number of manufacturing establishments existing in the districts.[17]

---

[17] The State of Michigan Economic Data Sheets, published in October, 1959, by the research division of the Michigan economic development department, disclose that the twelfth senatorial district (Oakland county) had the following population in 1950: total, 396,001; urban, 286,928; rural nonfarm, 95,795; rural farm, 13,278; and in 1954, had 1,249 commercial farms and 1051 manufacturing establishments. Similar figures for the thirteenth district (Genesee county) are as follows: total population, 270,963; urban, 201,857; rural nonfarm, 53,421; rural farm, 15,685; commercial farms, 1,617; manufacturing establishments, 286. Similar figures for the sixteenth and seventeenth districts, comprised in Kent county, are, taking an average for each district: total population, 144,146; urban population, 113,408; rural nonfarm, 20,470; rural farm, 10,267; commercial farms, 1,246; manufacturing establishments, 388. The twenty-seventh district comprises the counties of Antrim, Grand Traverse, Wexford, Benzie, Missaukee, Leelanau, and Kalkaska. Similar figures for such district are:

We have sought in vain to find some formula or formulae, even roughly approximate, competent to explain the groupings of counties and parts of counties into senatorial districts. It is impossible. The system, if such it is, defies explanation. Even the defendants in their briefs and appendices offer no more than the iteration and reiteration that this is representation by geographical area. But representation by geographical area, without more, is not enough. If it were, any gerrymander would be valid because the gerrymander always represents some geographical area, however grotesque. Upon what conceivable basis are the citizens of Kent county entitled to 2 senators and the citizens of some 7 counties, in 2 instances, and some 10 counties in another, entitled to only 1 senator? Why was Wayne county given 7 senators? Why do the 7 senators from Wayne county represent on the average almost twice the citizens that the senator from Washtenaw represents? And better than 5 times the number that the senator from Baraga, Houghton, Keweenaw, and Ontonagon? What is the explanation for the fact that the twelfth district (Oakland county), which, while nearly equal in area to the combined sixteenth and seventeenth districts (Kent county), contains almost 108,000 more citizens, nearly 3 times the number of manufacturing establishments, yet is entitled to only 1 senator while Kent county has 2 senators?

No formula for representative government in a

total population, 86,955; urban, 27,399; rural nonfarm, 32,411; rural farm, 27,145; commercial farms, 3,176; manufacturing establishments, 171. The twenty-eighth district comprises the counties of Osceola, Clare, Gladwin, Arenac, Iosco, Ogemaw, Roscommon, Alcona, Oscoda, and Crawford. Similar figures for such district are: total population, 82,453; urban, none; rural nonfarm, 49,462; rural farm, 32,991; commercial farms, 4,290; manufacturing establishments, 150. The thirtieth district comprises the counties of Menominee, Delta, Alger, Schoolcraft, Luce, Chippewa, and Mackinac. Similar figures therefor are: total population, 124,007; urban, 64,237; rural nonfarm, 36,741; rural farm, 23,029; commercial farms, 3,080; manufacturing establishments, 403.

democratic society is valid if "practical equality of representation on the chosen basis is destroyed."[18] Here there is no practical equality on any basis. We concluded above, after examination of many possible criteria, that the scheme of the amendment defies explanation. So it does, on any rational basis. But although no explanation on a basis of rational classification will withstand scrutiny, a reason for the districting suggests itself. The simple and obvious fact seems to be that the scheme is the perpetuation of the malapportioned population basis in existence, only by grace of defiance of the Constitution, at the time of the adoption of the amendment. The malapportionment existing at this time was a reproach to the democratic process and a monument to legislative indifference. It has gained nothing in respectability or validity by the new form in which cast.

No conclusion is possible save that this amendment to the Michigan Constitution violates the equal protection clause of the Fourteenth Amendment. The citizens' right to vote is eroded in some instances and multiplied in others and upon no discernible basis. We have reached, in fact, the situation posed hypothetically by Mr. Justice Douglas in *MacDougall* v. *Green:*[19]

"None would deny that a State law giving some citizens twice the vote of other citizens in either the primary or the general election would lack that equality which the Fourteenth Amendment guarantees."

Although not directly brought into issue in the arguments of the parties, we note that there is in this amendment an invidious discrimination not only

[18] *State, ex rel. Thomson.* v. *Zimmerman* (1953), 264 Wis 644, 652 (60 NW2d 416, 61 NW2d 300).
[19] 335 US 281, 288 (69 S Ct 1, 93 L ed 3).

against the urban interests, through the attempt to constitutionalize the malapportionment, but also against the nonurban interests, since there is no rational classification which groups the counties in the outstate area. Considering only the twenty-seventh, twenty-eighth, and thirtieth districts, we can see obvious and irrational classifications. The thirtieth district has 37,052 more people (almost 45% more) than the twenty-seventh district and 4,534 square miles more territory (considerably more than *double*), yet each district comprises 7 counties. The twenty-eighth district is comparable in population with the twenty-seventh (4,502 less persons) but is 2,173 square miles larger (over 60% larger), yet the twenty-eighth district encompasses some 10 counties. Considering the twenty-eighth district in relation to the thirtieth, we find that the twenty-eighth has approximately 65% of the population of the thirtieth (41,554 less people) and 2,361 square miles less territory, yet encompasses 3 more counties that the thirtieth district. We need carry the illustration no further.

The constitutional indefensibility of what has here been done is seen with the utmost clarity upon analysis of the arguments made in support thereof. First, it is pointed out that many States use a political unit (*e.g.* counties) as the basis of representation in the senate. So they do. Political scientists have debated for years whether the advantages of representation by political unit outweigh the disadvantages of population inequalities therefrom frequently encountered, since some counties are more populous than others. But all of this is irrelevant to our case. Michigan does not employ the political unit basis. It employed a population basis before the amendment, and the basis employed in the amendment itself we are trying to discover. Such constitutional provisions are not, then, precedent for what was done in this State.

But, defendants continue, even if Michigan does not employ the county as a basis for senate representation, at least it does employ parts of counties, whole counties, and multiples of counties in making up its units for senatorial representation. That, however, is precisely why the plaintiff is in court. He says these conglomerations of areas have been put together upon no rational basis. They are not political units, they are not industrial units, they are not farm units, they are not population units, nor are they recognizable combinations of any of these. As a matter of fact they are in general merely the continuation of the old malapportioned population districts. The fact that they are described in terms of parts of counties, whole counties, and multiples of counties means exactly nothing. Land may always be so described. There is no area of the State, no capriciously or deliberately gerrymandered acreage, that could not be described in these terms. The question remains, still unanswered, what basis has been used to bundle together these parts of counties, counties, and multiples thereof into districts?

In the final analysis, much of defendants' argument comes down to this: the majority of our people have limited the voting rights of certain of their fellow citizens, and since a majority has so acted we will not interfere. The argument denies 200 years of American constitutional law and it is more properly addressed to the English courts than our own. One of the principal reasons we of the United States have a written Constitution is to guard against excesses of the majority. It is not enough that the majority act. They must act in accordance with the "supreme Law of the Land."

We now reach the core of the case. The Constitution of the United States does not require, as we construe equal protection, that there be a precise mathematical correlation between the weights ac-

corded votes. It does not demand the precision of a physicist. But it does demand that the voter's right to substantial equality not be subject to gross, or to wilful and deliberate, deprivation, and it is no more palatable to us that it be accomplished on a grand scale than through the petty larceny of the ward heeler. *United States* v. *Classic,* 313 US 299 (61 S Ct 1031, 85 L ed 1368) ; *United States* v. *Saylor,* 322 US 385 (64 S Ct 1101, 88 L ed 1341). Nor are we able to disentangle, save as a matter of verbiage, the inequality of suffrage thus sought to be imposed, from inequalities of race or national origin, particularly when, in everyday life, the one is so inextricably intertwined with the others. It is clear from the 1950 census, portions of which are set out in the footnote,[20] that many of the vast areas partial-

---

[20] See 2 US Bureau of the Census, Census of Population: 1950, pt 22, Michigan, ch B.

| *Foreign Born Population (Table 42a)* | | *Negro Population (Table 42)* |
|---|---|---|
| Wayne | 350,028 | 335,414 |
| Macomb | 18,029 | 4,262 |
| Oakland | 32,766 | 18,124 |
| Genesee | 17,682 | 14,060 |
| Kent | 21,746 | 7,067 |
| Saginaw | 10,015 | 9,086 |
| Kalamazoo and St. Joseph (6th Sen. Dist.) | 8,123 | 3,003 |

Total foreign born
  in State  (Table 24)  603,735
Urban foreign born
  in State  (Table 24)  490,537
Total Negro
  (Table 14)  442,296  (6.9% of the total State population)
Urban Negro
  (Table 14)  421,917  (9.4% of the total urban population)
Rural nonfarm Negro
  (Table 14)  15,470  (1.3% of rural nonfarm population)
Rural farm Negro
  (Table 14)  4,909  (0.7% of rural farm population)
Foreign born in Wayne county
  (Table 42a)

| | |
|---|---|
| 81,878 | Canada |
| 59,632 | Poland |
| 29,044 | Italy |
| 22,901 | England and Wales |

ly disenfranchised in the State of Michigan are precisely those areas wherein are concentrated the reservoirs of manpower necessary to our industrial might, the emigrants from the South, and from foreign soil. The racial problems, the social problems, and the suffrage problems are here brewed together in a vast cauldron. The brew cannot be separated into ingredients, a pinch of this and a dash of that. The partial disenfranchisement of the citizens before us is only a part, but it is an inseparable part, of a much more comprehensive problem. It is no coincidence that many of these citizens are the same groups that face the problems both of inadequate schools and improper housing. In the latter 2 areas the courts have moved towards solutions consonant with our constitutional principles. Similar remedial action should not be here denied. Democracy will find the solutions for these problems, but only if it is allowed to work. It cannot work if the people are denied both the intelligence to make it work and the opportunity for its exercise.

Of this there is ample demonstration. Distinguished scholars have exposed again and again the disastrous consequences of the view that has so long prevailed, that no one can correct an unconstitutional deprivation of suffrage save those who profit by the deprivation.[21] What has actually resulted is that the base upon which our political structure was built, namely, "one man, one vote" has been distorted into "some privileged men, many votes," amply justifying, as we shall see, the prescient argument of Charles Francis Adams that "the moment a majority in a republic assumes to draw a distinction with the intent that certain men shall be enabled to enjoy twice or thrice the political power which an equal number of other men are to possess, that is the hour

[21] See Baker, Rural versus Urban Political Power; Lewis, Legislative Apportionment and the Federal Courts, 71 Harv L Rev 1057.

when tyranny begins."[22]   In the train of the break-down of constitutional law enforcement has come a minority rule, wherein the representatives of a few people control the welfare of the many.   Those paying the bulk of the taxes have only a minor representation.[23]   Communities of exploding population are helpless to cope with the problems created by the sheer press of numbers, the problems of schools, of transportation, of the decay of great population centers, of the flight to the suburbs, and the ever-increasing problems of the vast concentrations in industrial areas of those who become, early in life, too old to work.

But why have the courts not been vigilant to answer the repeated appeals made to them?

The objection most often heard is that we have presented a "political question," not capable of resolution by the courts.   Nothing has injected more confusion into this area of the law than the notion, a clear misconception, that political rights necessarily involve political questions, and therefore non-justiciable issues.   If this were true, many cases, literally hundreds, decided by the courts of all jurisdictions,[24] including our own as recently as 1944,[25] and the supreme court of the United States as recently as 1953,[26] were adjudicated by courts which acted improperly by deciding a "political issue."

No attempt will be made herein to define the precise limit of the so-called "political question."   The decisions constitute a maze, the thread of which seems at times to escape even the most astute com-

[22] Quoted in Luce, Legislative Principles, pp 346, 347; quoted in Baker, *supra*, p 9.

[23] Baker, *supra*, pp 3 and 4, citing the United States Conference of Mayors.

[24] A sampling of the cases appears at 2 ALR 1337.

[25] *Stenson* v. *Secretary of State* (1944), 308 Mich 48; *City of Lansing* v. *Ingham County Clerk* (1944), 308 Mich 560.

[26] *Terry* v. *Adams* (1953), 345 US 461 (73 S Ct 809, 97 L ed 1152).

mentators.[27]   In certain situations its application is clear.   Questions arising out of the conduct of our foreign relations, such as *Foster* v. *Neilson* (1829), 2 Pet (27 US) 253 (7 L ed 415), wherein the question involved the validity of a grant made by the Spanish government in 1804, are strictly political questions.   Questions involving a decision by the executive department as to who is sovereign of a particular territory are political questions, *Williams* v. *Suffolk Insurance Co.* (1839), 13 Pet (38 US) 415 (10 L ed 226).   Likewise, the determination whether a particular person is a duly accredited diplomatic agent to the United States involves the court in a political question, *In re Baiz* (1890), 135 US 403 (10 S Ct 854, 34 L ed 222).

Of similar import are cases involving a determination of whether or not a treaty is still in effect, *Terlinden* v. *Ames* (1902), 184 US 270 (22 S Ct 484, 46 L ed 534); *Charlton* v. *Kelly* (1913), 229 US 447 (33 S Ct 945, 57 L ed 1274, 46 LRA NS 397), which of 2 competing groups purporting to act as the lawful authority represents the government of a State, *Luther* v. *Borden* (1849), 7 How (48 US) 1 (12 L ed 581), the proof required that a statute has been enacted, *Field* v. *Clark* (1892), 143 US 649 (12 S Ct 495, 36 L ed 294), or a constitutional amendment ratified, *Coleman* v. *Miller* (1939), 307 US 433 (59 S Ct 972, 83 L ed 1385, 122 ALR 695).   In addition the courts have characterized as "political," questions relating to the termination

[27] Hart and Wechsler, The Federal Courts and the Federal System, pp 192–209 (1953); Dodd, Judicially Non-Enforceable Provisions of the Constitution, 80 U of Pa L Rev 54 (1931); Field, The Doctrine of Political Questions in the Federal Courts, 8 Minn L Rev 485 (1924); Finkelstein, Judicial Self-Limitation, 37 Harv L Rev 338 (1924); Weston, Political Questions, 38 Harv L Rev 296 (1925); Finkelstein, Further Notes on Judicial Self-Limitation, 39 Harv L Rev 221 (1925); note, 41 Harv L Rev 232 (1927); 1 Sutherland, Statutory Construction (3d ed Horack), §§ 201–230 (1943); note, 17 La L Rev 593 (1957); 1 Cooley, Constitutional Limitations (8th ed), pp 101–103 (1927).

of wars, *Commercial Trust Co. of New Jersey* v. *Miller* (1923), 262 US 51 (43 S Ct 486, 67 L ed 858), and what constitutes a republican form of government, such as adoption of the initiative and referendum, *Pacific States Telephone & Telegraph Co.* v. *Oregon* (1912), 223 US 118 (32 S Ct 224, 56 L ed 377).

In many of these cases considerable emphasis has been placed upon the theory of separation of powers. There is no doubt that the doctrine is applicable when the issue is whether the court should directly issue a writ of mandamus to the legislature, *e.g., Fergus* v. *Marks* (1926), 321 Ill 510 (152 NE 557, 46 ALR 960), or to an official of a coordinate branch of the government to control the exercise of executive discretion, *Georgia* v. *Stanton* (1868), 6 Wall (73 US) 50 (18 L ed 721). It is more than a mild form of revolt for one branch of government to assume powers properly within the exclusive domain of another. However, it is equally offensive to good government that one branch refuse to exercise powers committed to it. In such event the doctrine of separation of powers itself brings the wheels of government in that area to a complete stop, for under the doctrine no other branch can properly assume that which has been abandoned by its rightful guardian. It is for this reason that the doctrine of separation of powers as a deterrent to corrective action must be exercised with the utmost caution. It has not, in recent years, we observe, stood in the way of our condemnation of improper gubernatorial[28] or presidential[29] exercise of power.

It would be presumptuous to tender any capsule definition of the separation of powers doctrine. Possibly no greater precision should be attempted than

---

[28] *Faubus* v. *United States* (CCA 8), 254 F2d 797.

[29] *Youngstown Sheet & Tube Co.* v. *Sawyer,* 343 US 579 (72 S Ct 863, 96 L ed 1153, 26 ALR2d 1378).

to say, paraphrasing Hart and Wechsler,[30] that it involves a determination of which department of government should have the final say in the matter under examination. This, indeed, merely poses another question, but as to it, or under any separation of powers analysis, there can be only one answer when the question concerns an obvious and palpable violation of the Fourteenth Amendment. In preserving the ballot intact we usurp no function confided to another branch of government, but, rather, perform our time-honored function of guarding the constitutional guarantees of our people.

The preservation of the free and equal ballot as a matter of judicial cognizance and solicitude has had such ample implementation that it is difficult to make apt selection from the plethora of decided cases. The clearest possible enunciations are found in that series of cases relating to the exclusion of the Negro race from the political primaries.[31] It is held to be "an evil" to bar Negro voters from effective participation in the government of their State. If this principle may be taken as a point of departure, by what conceivable distinction may it be said that the voters before us may be denied effective participation in the government of their State? The right is equally individual to them and equally secured by the Federal Constitution.[32]

Nor, as we observed, does the circumstance that the restrictive action is sought to be accomplished by State constitutional, rather than statutory, provision invest the deprivation with any cloak of respectability. The classic case of this type is *Davis* v. *Schnell* (SD Ala), 81 F Supp 872, affirmed, *per curiam* (1949), 336 US 933 (69 S Ct 749, 93 L ed

[30] The Federal Courts and the Federal System, *supra*, pp 100–102.

[31] *E.g., Terry* v. *Adams*, 345 US 461 (73 S Ct 809, 97 L ed 1152); *Rice* v. *Ellmore*, 165 F2d 387, certiorari denied 333 US 875 (68 S Ct 905, 92 L ed 1151).

[32] *Perry* v. *Cyphers* (CCA 5), 186 F2d 608, 610.

1093), in which the Boswell amendment to the constitution of Alabama was struck as violative of the Fourteenth and the Fifteenth Amendments.

Particularly revealing, also, as to the asserted jurisdictional problem in the case before us, are those cases where the United States supreme court, without reference to such here-asserted obstacle, has considered the validity of State apportionment legislation within the framework of the Federal system. See *Smiley* v. *Holm,* 285 US 355 (52 S Ct 397, 76 L ed 795); *Koenig* v. *Flynn,* 285 US 375 (52 S Ct 403, 76 L ed 805); *Carroll* v. *Becker,* 285 US 380 (52 S Ct 402, 76 L ed 807).[33]

In actions at law for damages, as early as 1900, the United States supreme court has sustained the jurisdiction of the Federal courts in the matter of infringements upon the right to vote. The case of *Wiley* v. *Sinkler,* 179 US 58 (21 S Ct 17, 45 L ed 84), where a cause of action for refusal to accept a citizen's vote for a member of congress was found to be within the court's jurisdiction, furnished early precedent. The famous series of cases arising out of an attempt by Texas to exclude the Negro from voting, particularly in the primaries, followed. In these cases the primary vote was judicially noted by the courts to be of the essence of the electoral process. In *Nixon* v. *Herndon* (1927), 273 US 536 (47 S Ct 446, 71 L ed 759), a suit for damages against the judges of election resulted in a declaration that the Texas legislation prohibiting the Negro

---

[33] In these cases the question for decision was whether apportionment legislation was "legislation" within the meaning of the term as ordinarily used. If it were, then the governor's usual duty in perfecting the bill into law was required. The court held that it was such.

In the *Smiley* and *Carroll Cases* the governor had vetoed the apportionment bill; thus, no legislation had been enacted and elections at large were ordered. In the *Koenig Case,* the legislature to avoid a gubernatorial veto passed a concurrent resolution. Here, too, since no bill was enacted, elections at large were ordered.

from the primary election was in direct contravention of the Fourteenth Amendment. To the political question argument, Mr. Justice Holmes, speaking for the court, made very pointed answer (p 540):

"The objection that the subject matter of the suit is political is little more than a play upon words. Of course the petition concerns political action but it alleges and seeks to recover for private damage. That private damage may be caused by such political action and may be recovered for in a suit at law hardly has been doubted for over 200 years, since *Ashby* v. *White,* 2 Ld Raym 938 (92 Eng Rep 126); 3 Ld Raym 320 (92 Eng Rep 710), and has been recognized by this court. *Wiley* v. *Sinkler,* 179 US 58, 64, 65 (21 S Ct 17, 45 L ed 84). *Giles* v. *Harris,* 189 US 475, 485 (23 S Ct 639, 47 L ed 909)."

The subsequent step by Texas (to repeal this law and replace it with one empowering the executive committee of a political party to decide who was qualified to vote in the primary) also came before the courts, with like result. *Nixon* v. *Condon* (1932), 286 US 73 (52 S Ct 484, 76 L ed 984, 88 ALR 458). In one of the final cases of the series, *Smith* v. *Allwright* (1949), 321 US 649 (64 S Ct 757, 88 L ed 987, 151 ALR 1110), an action for damages, wherein the "State action" was condemned under the Fifteenth Amendment, it was held, in part, that (pp 661, 662, 657):

"It may now be taken as a postulate that the right to vote in such a primary for the nomination of candidates without discrimination by the State, like the right to vote in a general election, is a right secured by the Constitution."

"Texas is free to conduct her elections and limit her electorate as she may deem wise, save only as her action may be affected by the prohibitions of the United States Constitution or in conflict with powers

delegated to and exercised by the national government."

The criminal prosecutions under the provisions of the civil rights acts of both State and Federal election officials are probably the most famous and oft-cited cases. *Ex parte Yarborough* (1884), 110 US 651 (4 S Ct 152, 28 L ed 274); *United States* v. *Mosley* (1915), 238 US 383 (35 S Ct 904, 59 L ed 1355); *United States* v. *Classic* (1941), 313 US 299 (61 S Ct 1031, 85 L ed 1368); *United States* v. *Saylor* (1944), 322 US 385 (64 S Ct 1101, 88 L ed 1341), are leading examples. Basic to the conclusion of the Court in these cases (that the prosecution was proper under Federal law) is the determination that a Federally protected right has been violated.

It is beyond question that "State action which denies due process or equal protection of the laws in the exercise of the right of suffrage is prohibited by the Fourteenth Amendment,"[34] and that:[35]

"Where discrimination is sufficiently shown, the right to relief under the equal protection clause is not diminished by the fact that the discrimination relates to political rights. *McPherson* v. *Blacker,* 146 US 1, 23, 24 (13 S Ct 3, 36 L ed 869); *Nixon* v. *Herndon,* 273 US 536, 538 (47 S Ct 446, 71 L ed 759): *Nixon* v. *Condon,* 286 US 73 (52 S Ct 484, 76 L ed 984, 88 ALR 458); see *Pope* v. *Williams,* 193 US 621, 634 (24 S Ct 573, 48 L ed 817). But the necessity of a showing of purposeful discrimination is no less in a case involving political rights than in any other."

In all of the above cases the courts have acted with vigor to preserve to each citizen his political voice, his right to vote. The "political question" objection, when raised, has been dismissed. The same result is reached regardless of the remedy sought to be

[34] *Davis* v. *Schnell* (SD Ala), 81 F Supp 872, 876.
[35] *Snowden* v. *Hughes* (1944), 321 US 1, 11 (64 S Ct 397, 88 L ed 497).

employed.   In criminal prosecutions, in mandamus against the secretary of State or like officials, in advisory opinions, in declaratory judgments, and in writs of prohibition and certiorari the courts have not hesitated to preserve the integrity of the ballot from discrimination, bias, fraud, malapportionment, or other unconstitutional activity.

A court in deciding whether or not a particular issue is justiciable must take cognizance of the reasoning employed by other courts, State as well as Federal, in considering similar cases, even though they are not binding precedent on the Federal question of justiciability.   Generaly speaking, the State courts have not hesitated to act in order to protect the right to vote, and often without discussing the jurisdictional question.   Thus many courts,[36] including those of this State,[37] have considered the validity of laws enacted to apportion the State into legislative districts according to a constitutional mandate, to comply with the constitutional requirement of contiguity,[38] limitations upon the numbers of senators or representatives,[39] adherence to county and ward lines,[40] that districts be equal in population as nearly as may be practical,[41] as well as the validity of ap-

---

[36] Examples of cases are collected in the following references:   18 Am Jur, Elections, § 29; 2 ALR 1337; 43 Ill L Rev 180, nn 36, 37, 39; 37 Ill L Rev 20, nn 25, 26, 27; 71 Harv L Rev 1057, nn 48, 49.

[37] *Board of Supervisors of Houghton County* v. *Secretary of State,* 92 Mich 638 (16 LRA 432); *Giddings* v. *Secretary of State,* 93 Mich 1 (16 LRA 402); *Williams* v. *Secretary of State,* 145 Mich 447; *Stevens* v. *Secretary of State,* 181 Mich 199; *Stenson* v. *Secretary of State,* 308 Mich 48; *City of Lansing* v. *Ingham County Clerk,* 308 Mich 560.

[38] Examples of cases on this point appear in the following:   37 Ill L Rev 20, n 33; 71 Harv L Rev 1057, n 52.

[39] See cases collected in 37 Ill L Rev 20, nn 29, 30, 31.

[40] Examples of cases are collected in:   37 Ill L Rev 20, n 34; 71 Harv L Rev 1057, n 53.

[41] The best examples of cases and discussions on the point of an apportionment statute violating a constitutional requirement of district of equal population are the following:

*Ragland* v. *Anderson,* 125 Ky 141 (100 SW 865, 128 Am St Rep 242).

*Stiglitz* v. *Schardien,* 239 Ky 799 (40 SW2d 315).

portionment legislation upon the "fundamental principle of equality of representation."[42]

Thus, in *Gates* v. *Long,* 172 Tenn 471 (113 SW2d 388), the court invalidated a law which sought to re-establish a system of compulsory primary elections for the purpose of both permitting and requiring the electorate to participate. It was provided that the maximum county-unit vote of any county should be 1/8th of 1% of the county's population. In striking the law as an arbitrary infringement of the rights of the citizens, the court said (p 477):

"With respect to their right to vote in the primary election of their party, the supreme court in the Texas cases has 3 times said that citizens were entitled to the protection of the Fourteenth Amendment to the Federal Constitution. (Citations omitted.) For the same reasons they would be entitled to the protection of section 8 of article 1, and section 8 of article 11, of the constitution of Tennessee (1870), the equal protection of the law. That is to say the State cannot confer this right upon one class of voters and deprive another class of voters of such right unless the discrimination can be justified on some rational basis."

---

*Moran* v. *Bowley,* 347 Ill 148 (179 NE 526).

*Denny* v. *State,* 144 Ind 503 (42 NE 929, 31 LRA 726).

*Parker* v. *State, ex rel. Powell,* 133 Ind 178 (32 NE 836, 18 LRA 567).

*Brown* v. *Saunders,* 159 Va 28 (166 SE 105).

*Parkinson* v. *Watson,* 4 Utah2d 191 (291 P2d 400).

*Donovan* v. *Holzman,* 8 Ill2d 87 (132 NE2d 501).

*Attorney General* v. *Suffolk County Apportionment Commissioners,* 224 Mass 598 (113 NE 581).

*Brophy* v. *Suffolk County Apportionment Commissioners,* 225 Mass 124 (113 NE 1040).

[42] *Ballantine* v. *Willey* (1893), 3 Idaho 496 (31 P 994, 997, 95 Am St Rep 17); *Ragland* v. *Anderson* (1907), 125 Ky 141 (100 SW 865, 869, 128 Am St Rep 242); In *Ragland,* the court subordinated the constitutional provision regarding the joining of 2 counties to the principle of equality of representation. *Harte* v. *Moorehead* (1916), 99 Neb 527 (156 NW 1067, 1069, 1070); *People, ex rel. Van Bokkelen,* v. *Canaday* (1875), 73 NC 198, 225 (21 Am Rep 465).

Continuing the tradition of drawing the fundamental right of suffrage under the protective covering of due process and equal protection is *Preisler*
v. *Calcaterra,* 362 Mo 662 (243 SW2d 62) noted in 38
Va L Rev 672, wherein a law effectively restricting
the right to representation on the board of election
commissioners and the right to challengers and
watchers at the polls to the 2 largest political parties
was found to be violative of equal protection. See,
also, *State, ex rel. Witt,* v. *Bernon* (1922), 11 Ohio
Law Abst 318.

As was pointed out by the court in *Preisler* v. *Calcaterra, supra,* it has also become well recognized
that the legislature may validly require more than
a small, minimum percentage of the vote cast at the
last election, or a specified number of signatures to
petitions, for a party or a candidate to be accorded
certain privileges at a later election.   These laws,
however, are subject to constitutional limitations in
that the standard fixed by the legislature as the basis
for the privilege must not be arbitrary, unreasonable, or lacking in uniformity. Examples of such laws
that fell to the constitutional mandate are *People,
ex rel. Hotchkiss,* v. *Smith* (1912), 206 NY 231 (99
NE 568), and *State, ex rel. Allen,* v. *Flaherty* (1918),
40 ND 487 (169 NW 93).

There is no need further to accumulate cases. It
is abundantly clear that the safeguard of the ballot
against both denial and dilution has been accomplished in scores of cases despite appeal to the doctrine of the political question. But a formidable reason for inaction has been cited to us, namely, a series
of Federal cases commencing with *Colegrove* v.
*Green* (1946), 328 US 549 (66 S Ct 1198, 90 L ed
1432), and culminating in *Baker* v. *Carr* (MD
Tenn, 1959), 175 F Supp 649.   These cases,
argued to us at some length, present interesting and

complex legal problems, but they are not precedent in the matter before us.

The facts in *Colegrove* are familiar to all students of the problem and need be only briefly reviewed. The plaintiff sought a declaratory judgment and injunctive relief in the Federal district court against the governor, the secretary of State, and the auditor of the State of Illinois, as *ex officio* members of the primary certifying board. The object of the suit was to restrain the board from taking action preparatory to the November election under an apportionment act enacted by the State legislature in 1901. The claimed invalidity was that the legislation, as it apportioned congressional districts, violated the Federal reapportionment act of 1911, through lack of compactness of territory and equality of population, as required by the Federal act.

The court, in a decision wherein a majority did not agree as to the *ratio decidendi,* refused the relief. Three members of the court stated that the case was controlled by *Wood* v. *Broom.*[43] As an additional ground for decision the same 3 justices expressed agreement with the 4 dissenting justices who had stated in the *Wood Case* that the suit should be dismissed for want of equity. The decisive fourth vote upon the point that equity should not intervene in this situation was cast by Mr. Justice Rutledge, who, in concurring in the result, stated (p 565):

"Assuming that the controversy is justiciable, I think the cause is of so delicate a character, in view of the considerations above noted, that the jurisdiction should be exercised only in the most compelling circumstances."

The other members of the court agreed that the controversy was justiciable and that equity should intervene here as it had in other right-to-vote cases.

---

[43] (1932), 287 US 1 (53 S Ct 1, 77 L ed 131).

In an opinion by Mr. Justice Black, it was stated (p 569):

"The 1901 State apportionment act if applied to the next election would thus result in a wholly indefensible discrimination against appellants and all other voters in heavily populated districts. The equal protection clause of the Fourteenth Amendment forbids such discrimination. It does not permit the States to pick out certain qualified citizens or groups of citizens and deny them the right to vote at all. See *Nixon* v. *Herndon,* 273 US 536, 541 (47 S Ct 446, 71 L ed 759); *Nixon* v. *Condon,* 286 US 73 (52 S Ct 484, 76 L ed 984, 88 ALR 458). No one would deny that the equal protection clause would also prohibit a law that would expressly give certain citizens a half vote and others a full vote."

Thus, a majority of the court decided that jurisdiction does exist in this type of case, but a majority of the court, differently composed, decided that in this case it should not be exercised. A decision on the merits, as discussed by Mr. Justice Black, was never reached.

Following *Colegrove* v. *Green,* the court in *MacDougall* v. *Green,*[44] unanimously accepted jurisdiction of the question, although Mr. Justice Rutledge again felt that the lateness of the hour, 12 days before the election, should compel equity to decline to exercise its jurisdiction, "but solely for this reason." A majority of the court decided that the Illinois statute which required, as a prerequisite to the formation of, and nomination of candidates by, a new political party, petitions signed by 25,000 voters, with 200 signatures by voters in each of at least 50 counties, was not violative of the Federal Constitution. Without discussing the merits of the jurisdictional problem, the majority declared that (p 283):

[44] (1948), 335 US 281, 284, 287 (69 S Ct 1, 93 L ed 3).

"It is allowable State policy to require that candidates for State-wide office should have support not limited to a concentrated locality. This is not a unique policy."

Again, there was a vigorous dissent by Mr. Justice Douglas, joined by Justices Black and Murphy (p 288):

"Discrimination against any group or class of citizens in the exercise of these constitutionally protected rights of citizenship deprives the electoral process of integrity. * * *
"None would deny that a State law giving some citizens twice the vote of other citizens in either the primary or the general election would lack that equality which the Fourteenth Amendment guarantees."

Defendants derive considerable comfort from *MacDougall*. Its applicability is not so apparent to us. What is complained of in the case before us is a parceling of the State into arbitrary units having no relation to any rational scheme of classification, whether geographical, social, economic, or of population.

Should such whimsicality exist there is not a shred of support for the constitutional validity thereof in *MacDougall's* holding that it is permissible State policy that candidates for State-wide offices have State-wide support.

The case of *South* v. *Peters* (1950), 339 US 276 (70 S Ct 641, 94 L ed 834), however, affirming (ND Ga), 89 F Supp 672, involves considerations more complex. The essence of the holding in the case, as we read it, is (p 277) that:

"Federal courts consistently refuse to exercise their equity powers in cases posing political issues arising from a State's geographical distribution of electoral strength among its political subdivisions."

It seems much too inclusive to say that the *South Case* stands for the proposition that Federal courts will never interfere with the State electoral machinery. We know better. It may mean that the Federal courts will not, as against a recalcitrant State government, shoulder what amounts to the overall burden of devising and enforcing fair voting procedures in that State for the entire polity. That, of course, is not this case. The question before us is merely the validity of the challenged amendment. From that point forward the burden rests on the State authorities which cannot be assumed unready, unwilling, or unable to act. Or, it may mean that electoral representation based upon the political units of State government will not be invalidated by the Federal courts. Whether thus broadly stated the principle is constitutionally defensible we need not vex. For in the case before us there is no recognizable unit employed in the classifications made. We have no more than an arbitrary division of the State into areas. At the best it is wholly capricious. At the worst, it is deliberate. In either event it is wholly indefensible. We conclude that *South v. Peters* is not precedent against our holding that such classification is in violation of the Fourteenth Amendment. To us it is significant that the Federal cases commencing with *Colegrove* v. *Green, supra,* and continuing through *Colegrove* v. *Barrett,*[45] *Rem-*

45 330 US 804 (67 S Ct 973, 91 L ed 1262). Colegrove, having failed in the action to enjoin the November, 1946, election, sought in this suit to enjoin all future elections under the *1901 apportionment act.* The supreme court dismissed for want of a substantial Federal question. Mr. Justice Rutledge concurred in the result because the court refused to grant a rehearing in *Colegrove* v. *Green,* 329 US 825, 828 (67 S Ct 118, 199, 91 L ed 701, 703), and because it refused to hear the *Cook* and *Turman Cases.* *Cook* v. *Fortson* (ND Ga), 68 F Supp 624; *Turman* v. *Duckworth* (ND Ga), 68 F Supp 744, appeal dismissed as moot, 329 US 675 (67 S Ct 21, 91 L ed 596).

*mey* v. *Smith*,[46] *Kidd* v. *McCanless*,[47] *Perry* v. *Folsom*,[48] *Radford* v. *Gary*,[49] *Baker* v. *Carr*,[50] and *Magraw* v. *Donovan*,[51] all involve an unsuccessful attempt to invalidate, upon Federal constitutional

[46] (ED Pa), 102 F Supp 708, motion to dismiss granted, and appeal dismissed for want of a substantial Federal question, 342 US 916 (72 S Ct 368, 96 L ed 685). Herein a Pennsylvania citizen sought, through the equity jurisdiction of the Federal district court, to invalidate a 1921 Pennsylvania apportionment act, to compel the legislature to reapportion and to enjoin the secretary of State from holding elections until an apportionment act was enacted. The suit was premised upon the argument, as are most in this area, that the plaintiff's rights under the Fourteenth Amendment were violated, particularly by the legislative failure to reapportion.

[47] 200 Tenn 273 (292 SW2d 40), motion to dismiss granted and appeal dismissed, 352 US 920 (77 S Ct 223, 1 L ed 2d 157), *per curiam*. In this case the plaintiff sought to have the *1901 apportionment act of Tennessee* declared invalid and to secure an injunction restraining further elections under that law. The Tennessee court refused relief because of remedial problems. The United States supreme court in dismissing referred to *Colegrove* and *Anderson* v. *Jordan*, 343 US 912 (72 S Ct 648, 96 L ed 1328), facts noted in 20 US Law Week 3252, 3253, an attack upon the 1951 California apportionment legislation by way of mandamus which failed. The California opinion is unreported.

[48] (ND Ala), 144 F Supp 874. This suit was against the governor, the lieutenant governor, and the secretary of State in equity on the ground that the failure of the legislature to reapportion itself in accord with the Alabama constitution of 1901 caused a denial of due process and equal protection of the laws to the plaintiffs. The court granted a motion to dismiss.

[49] (WD Okla), 145 F Supp 541, affirmed *per curiam*, 352 US 991 (77 S Ct 559, 1 L ed 2d 540). This also was an attempt by way of the equity jurisdiction of the Federal courts to set aside an outmoded apportionment act—the *1910 Oklahoma legislation*. The usual claims were denied for the usual reasons.

[50] (MD Tenn), 175 F Supp 649. Again the *1901 Tennessee apportionment act* was questioned on the usual constitutional grounds, in equity, and relief was denied. The citation referred to is the ruling of the district court on the motion to dismiss, which was denied. On December 21, 1959, the court dismissed the action. Civ. Act. No. 2724. Subsequently on December 31, 1959, the court dismissed the action. 179 F Supp 824.

[51] (Minn), 159 F Supp 901. The district judge refused to dismiss the action in equity which sought to declare the *1913 Minnesota reapportionment act* invalid and to restrain the secretary of State from holding elections thereunder.

(Minn), 163 F Supp 184. A 3-man constitutional court was convened but refused to act until the January 1959 session of the Minnesota legislature had met, on the ground that it should have 1 more opportunity to correct the situation and obey the constitutional mandate. The court retained jurisdiction for 60 days.

(Minn), 177 F Supp 803. The legislature did reapportion at this session; therefore, the court accepted the plaintiff's motion to dismiss.

grounds, an ancient State reapportionment statute unchallenged when enacted but long-since rendered unequal and discriminatory in its operation due to lapse of time and change of circumstances (*e.g.*, the 1901 Illinois act, the Tennessee 1901 act, the Oklahoma 1910 act). Here both State and Federal courts, with certain recent exceptions (*Magraw* v. *Donovan* (Minn), 163 F Supp 184; *Dyer* v. *Kazuhisa Abe* (Hawaii), 138 F Supp 220), have traditionally refused to intervene, at law or in equity. The result is that an antiquated apportionment act is maintained in force. Through shifts and growths in population, the State then has a legislative body, largely not representative of the people, enacting law, levying taxes, approving appointments, and performing the other duties incident to its position. We thus have the "silent gerrymander." The legislature has accomplished indirectly that which would be declared unconstitutional if attempted through legislation. The situation created and tolerated involves a direct contravention of the Constitution, as is frequently conceded by the defendants involved,[52] and the courts, and results from a refusal by constitutional officers to perform their sworn duties.[53]

[52] *Jones* v. *Freeman*, 193 Okla 554 (146 P2d 564), appeal dismissed and certiorari denied, 322 US 717 (64 S Ct 1288, 88 L ed 1558). The Oklahoma court recognized that the act had become unconstitutional through the passage of time and the changes in circumstances and, thus, infringed the right of equality of representation under the Oklahoma constitution. The court, however, denied relief because of the remedial difficulties.

In *Radford* v. *Gary* (WD Okla), 145 F Supp 541, see note 49, *supra*, the attorney general conceded that there was a denial of the equal protection of the law.

[53] Examples, from many cases stating the duty, are: *Opinion of the Justices*, 254 Ala 185 (47 S2d 714); *Opinion of the Justices*, 148 Me 404 (94 A2d 816); *Brewer* v. *Gray* (Fla), 86 S2d 799; *Magraw* v. *Donovan* (Minn), 163 F Supp 184.

The oath which the legislators take upon assumption of their duties is as follows:

"I do solemnly swear (or affirm) that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of ................,

Thus the refusal to perform an obligation imposed by the Constitution itself is permitted to take from our people the basic right upon which all others depend, the right to have a government of their choice and subject to their will.

Our reading of the Federal cases suggests to us that they have been far too broadly interpreted. They do not, in our opinion, stand for the generalities attributed to them. Particularly are we disinclined to their broad construction when such construction brings us in conflict with basic constitutional guarantees and involves an abdication of our judicial function. The cases are not authority for the uses sought to be made of them, nor for the distortion of legal principles at times attributed thereto. The right to vote, it is true, is a political right, but we do not gather from these cases that the issue before the Court in its deprivation is always "political" and nonjusticiable. The doctrine of separation of powers is not necessarily involved simply because the wrongdoer is a sheriff or a selectman. If it were, our public vaults would be open to pillage on a scale matched only by the deprivation of rights before us. It is true that we will not mandamus a coordinate branch of government but we are not required so to do, any more than a court is required to mandamus a town council to pass a proper peddler's licensing ordinance if the ordinance condemned is discriminatory. Most offensive to proper resolution of the question before us is the misapplication of the doctrine that we will not do indirectly that which we cannot do directly. It begs the question to assume that what we are asked to "do" is forbidden. Will we refuse to enforce a criminal statute because we cannot pass it in the first place? Are we "doing in-

according to the best of my ability." Mich Const (1908), art 16, § 2.
    The duty of reapportionment of the senate, prior to the 1952 amendment was imposed by Mich Const (1908), art 5, § 4.

directly" (in punishing kidnapping) that we could not do directly (pass a law forbidding kidnapping)?

The fear often expressed by the courts, also not properly attributable to the Federal cases, is that although they may, in common with great numbers of others, deplore the deprivation of suffrage, and although they have the power and the jurisdiction to act, they should not, because their decrees may be ignored and thus, in the inevitable conflict with the recalcitrant, the impotence of the courts may publicly be laid bare. In other words, that it is judicially more sagacious to be publicly indifferent than publicly impotent. The eminence of those cherishing this philosophy compels our deference, both to it and to them. Yet the thought thus expressed was persuasive neither to Chief Justice Marshall[54] nor to Lord Coke[55] (*"quod rex non debet esse sub homine, sed sub Deo et lege"*) and it does not commend itself to us. We do not lack for the means to enforce our decrees.

But our public proclamation that some forces are so mighty that we dare not risk the battle breeds in itself a kind of contempt for the law that must be weighed against the perils of nonenforceability, should such in truth actually exist. We will, as everyone knows, pursue as the hound the hare some petty ballot-box stuffer. Yet if the violation of the Fourteenth Amendment be accomplished by State legislative nonaction, or affirmative constitutional action, we are to stand waxen and graved while the ravage continues. With this philosophy of the law I am in the most thorough disagreement. My thought was expressed hundreds of years ago, with

[54] 4 Beveridge, Life of John Marshall, p 551.

[55] Prohibitions Del Roy, 12 Co Rep 63, 65 (77 Eng Rep 1342): "with which the king was greatly offended, and, said, that then he should be under the law, which was treason to affirm, as he said; to which I said, that Bracton saith, *quod rex non debet esse sub homine, sed sub Deo et lege."*

the utmost simplicity, by Lord Coke, in his reply to James I: "The king is under the law." So, in truth, I hold, are all majorities of our people.

When we of the courts stand silently acquiescent under these circumstances we nurture a double standard of constitutional morality, one law for the mighty, another for the weak. "There is little doubt," as de Grazia[56] commented, "that a flagrant contradiction between law and practice, such as exists between the legally stipulated criteria of apportionment and the actual apportionment in a number of American States, causes great moral uneasiness and discontent." When we turn deaf ears to the people's pleas for relief from pillage of their basic freedoms we abdicate our constitutional function. Let those who will, say our words would be empty, since we keep no armory. We keep the mightiest armory known to man, the sovereign conscience. It is our duty to give voice to its demands as well as to implement it with our decress. As Rostow put it: "The work of the court can have, and when wisely exercised does have, the effect not of inhibiting but of releasing and encouraging the dominantly democratic forces of American life. The historic reason for this paradox is that American life in all its aspects is an attempt to express and to fulfil a far-reaching moral code. * * * The prestige and authority of the supreme court derive from the fact that it is accepted as the ultimate interpreter of the American code in many of its most important applications."[57]

So much for the dissection of cases. We need not, we assume, join our Brothers in protesting our adherence to Federal authority on Federal questions.

[56] General Theory of Apportionment, in Symposium, *supra*, 17 Law & Contemp Prob 256, 262.

[57] Eugene V. Rostow, The Democratic Character of Judicial Review, 66 Harv L Rev 193, 210.

But the difficulty with this case is not the lack of precedent but its abundance. Our problem, as always, is the choice between precedents. Here, in our opinion, the controlling precedent is the Federal precedent, to which ample reference has been made, holding that our people may, by no process, be disenfranchised. The point to be stressed is that we do not, in the case now before us, confront the situation in which the courts, rightly or wrongly, interpret the relief prayed as the construction by them of a new State electoral structure, and in a hurry at that. Our problem is far different. We rule as to the constitutional validity of the partial disenfranchisement of a great group of citizens through the operation of a theory of classification which defendants are unable to explain and we are unable to discover. Our assumption will be, of course, that once its invalidity is exposed, the proper organs of government will hasten to rectify the wrong.

An additional question has been raised concerning the validity of the 1952 amendment in respect to its compliance with article 17, § 3, which requires in not more than 100 words "a true and impartial statement of the purpose of the amendment or question in such language as shall create no prejudice for or against such proposal." In other words, we are asked to say at this time the people did not know for what they voted in 1952. This we cannot do. Constitutional provisions are not lightly to be upset. It is only after most serious consideration that we have concluded the presently-stated violation of the guarantee of equal protection invalidates the amendment. See *City of Jackson* v. *Commissioner of Revenue,* 316 Mich 694; *Romano* v. *Auditor General,* 323 Mich 533; see, also, *Graham* v. *Miller,* 348 Mich 684.

As to the asserted "laches" of the plaintiff in seeking the relief of the Court, the argument that he has

delayed an unreasonable time in so doing, we cannot hold that in the few years since the adoption of this amendment that the plaintiff, or any other citizen, has waived his objections to the constitutional invalidity of this change in our government. There is never a vested right in a public wrong and we indulge every reasonable presumption against waiver. (See *Empsak* v. *United States,* 349 US 190 [75 S Ct 687, 99 L ed 997]; *Board of Supervisors of Houghton County* v. *Secretary of State, supra.*) There was none here.

Finally it is urged to us that we remit the petitioners to their remedy at the ballot box. But if anything is clear in this whole sorry picture of encroachment and deprivation it is the futility of the asserted ballot-box "remedy." Why? Because if the petitioners had access (on equal terms) to the ballot box for the election of their representatives they would not be before us. The remedy we tell them to employ is the very remedy they come to us seeking. Denial of the right of suffrage, in and of itself, gives rise to considerations of the most peculiar and impelling nature, since the deprivation of the right automatically insures deprivation of the remedy to which the luckless suitor is remitted by the courts, namely, the ballot box. *Cf.* Stone, C. J., in *United States* v. *Carolene Products Co.,* 304 US 144, 152, n 4 (58 S Ct 778, 82 L ed 1234). The remedy is illusory and we reject it.

It is a somber and frightening thing to take from the people in a democracy their right to an equal vote. We rob them at one stroke of their sword and their shield. We render them powerless. We invite their exploitation. We insure the perpetuations in the body politic of the most malignant growths. We breed cynicism and contempt for the processes of government. The sorry catalog of abuses of minority rule, here shown in small part,

amply demonstrates that government by only part of the people is both pernicious and destructive. The yoke must be responsive to the needs of those on whose neck it rests. Every recourse at our command should be devoted to the protection of the guaranteed right of the free and equal ballot.

Our conclusion is that the 1952 amendment to the Constitution of the State of Michigan is in violation of the equal protection clause of the Fourteenth Amendment and null and void.

There is no merit in additional questions argued.

The writ of mandamus should issue as prayed respecting the performance of acts by the secretary of State preparatory to and in implementation of the constitutional and statutory provisions respecting the election of State senators. This Court should retain jurisdiction of the cause awaiting corrective and prescribed action by the appropriate branches of government in accordance with the unamended constitutional mandate. Failing such action within 60 days hereof this Court should entertain a petition by any party hereto to rule specifically upon the matter of remedy.

No costs, a public question.

ADDENDUM:

Defendants' reliance upon the case of *Minor* v. *Happersett,* 88 US 162 (22 L ed 627), is misplaced. The *Minor Case* was brought under the now "almost forgotten privileges and immunities clause of the Fourteenth Amendment,"[58] not here relied upon, asserting that female suffrage was a necessary incident of Federal citizenship. It was held that it was not. But this is far from a holding that those having the suffrage may be made subject to discrimination in the exercise thereof. This was made abundantly

[58] Stone, C. J., dissenting in *Colgate* v. *Harvey,* 296 US 404, 443 (56 S Ct 252, 80 L ed 299, 102 ALR 54).

clear in the later *Cruikshank Case*.[59]    Here Mr. Chief Justice Waite, who had himself written for the court in the *Minor Case*, discussed the application to that case of the principles of constitutional equality, and prohibitions of discrimination, holding that (*Minor, supra*), although the right of suffrage (pp 555, 556) "is not a necessary attribute of national citizenship," nevertheless, "exemption from discrimination in the exercise of that right on account of race, et cetera, is." He continues: "The right to vote in the States comes from the States; but the right of exemption from the prohibited discrimination comes from the United States."

Defendants' efforts, moreover, to distinguish the *Nixon Case, supra,* on the ground that the right to vote therein protected was upheld by reliance in part upon the Fifteenth Amendment, is rejected by Mr. Justice Holmes who wrote for the Court in the first *Nixon Case* (pp 540, 541): "We find it unnecessary," he held, "to consider the Fifteenth Amendment, because it seems to us hard to imagine a more direct and obvious infringement of the Fourteenth." *Smith* v. *Allwright, supra,*[60] was equally clear (p 660): "The *Nixon Cases*[61] were decided under the equal protection clause of the Fourteenth Amendment." Nor did the *Colegrove* opinion, *supra,* discuss or distinguish the *Nixon Cases* upon any Fifteenth Amendment ground. It is clear that the deprivation of the right to vote arising from an arbitrary classification, the situation presented to us, is not dependent upon the Fifteenth Amendment.

Souris, J., concurred with Smith, J.

---

[59] *United States* v. *Cruikshank*, 92 US 542 (23 L ed 588).

[60] (1949), 321 US 649 (64 S Ct 757, 88 L ed 987, 151 ALR 1110).—Reporter.

[61] *Nixon* v. *Herndon* (1927), 273 US 536 (47 S Ct 446, 71 L ed 759); *Nixon* v. *Condon* (1932), 286 US 73 (52 S Ct 484, 76 L ed 984, 88 ALR 458).—Reporter.

EDWARDS, J.  The basic question posed by this petition is:  Does the Fourteenth Amendment to the United States Constitution prohibit any State from enacting provisions for electoral districts for 1 house of its legislature which result in substantial inequality of popular representation in that house?

Petitioner seeks a declaration by this Court that the provisions of the 1952 amendment to article 5, §§ 2 and 4, of the Constitution of the State of Michigan violate the equal rights and due process provisions of the Fourteenth Amendment of the United States Constitution and hence should be declared void by this Court.

The 1952 amendments to article 5 froze 30 existing unreapportioned senate districts into the Michigan Constitution and divided into 4 districts 2 other existing senate districts in 2 very populous areas. The amendments removed any constitutional requirement of equal apportionment.  The result is constitutionally prescribed representation by geographic districts (consisting of single counties, or groups of contiguous counties, or subdivisions of a single county) unequal in size and in population. The constitutional provision objected to does indeed grant totally disproportionate representation in the Michigan senate to certain counties of the State as opposed to others (including the one wherein petitioner resides[1]), and the discrimination in this regard appears generally to favor rural voters as opposed to urban voters and thinly populated areas as opposed to densely populated areas.

1.  There can be, of course, only 1 authoritative interpretation of the Constitution of the United States—that of the supreme court of the United

---

[1] The senate district in which petitioner resides contains the largest population of any.  Comparing it to that district having the smallest population, the disproportion, employing 1950 census figures, was 6-1/2:1.  Employing preliminary 1960 figures, the disproportion is 12-1/2:1.

States as expressed by its majority opinions. US Const, art 3, § 2; *Cohens* v. *Virginia,* 6 Wheat (19 US) 264 (5 L ed 257); *Radford* v. *Gary* (WD Okla), 145 F Supp 541, affirmed 352 US 991 (77 S Ct 559, 1 L ed 2d 540).

Once the United States supreme court has spoken on a question involving the Federal Constitution, all other courts in this land, including ours, are bound by its decisions. *Book Tower Garage, Inc.,* v. *Local No. 415,* 295 Mich 580; *Town & Country Motors, Inc.,* v. *Local Union No. 328,* 355 Mich 26, 46; *People* v. *Gonzales,* 356 Mich 247.

It is clear to us that the question posed here has been repeatedly presented to the United States supreme court and repeatedly answered in the negative. *Colegrove* v. *Green,* 328 US 549 (66 S Ct 1198, 90 L ed 1432); *Cook* v. *Fortson,* 329 US 675 (67 S Ct 21, 91 L ed 596); *South* v. *Peters,* 339 US 276 (70 S Ct 641, 94 L ed 834); *Remmey* v. *Smith,* 342 US 916 (72 S Ct 368, 96 L ed 685); *Anderson* v. *Jordan,* 343 US 912 (72 S Ct 648, 96 L ed 1328); *Kidd* v. *McCanless,* 352 US 920 (77 S Ct 223, 1 L ed 2d 157); *Radford* v. *Gary, supra; Hartsfield* v. *Sloan,* 357 US 916 (78 S Ct 1363, 2 L ed 2d 1363).

See, also, *MacDougall* v. *Green,* 335 US 281 (69 S Ct 1, 93 L ed 3); *Matthews* v. *Handley,* 179 F Supp 470, affirmed 361 US 127 (80 S Ct 256, 4 L ed 2d 180).

In each of these 8 principal cases cited (as in this one), an attack was made upon State provisions for voting rights which resulted in substantial inequality of voting strength to some voters as opposed to others; in each instance, the attack was (as in this one) based upon the Fourteenth Amendment, and in each instance the relief requested was refused by a majority of the United States supreme court justices participating.

It is suggested that, even though this be true, still the essential problem was left so much in doubt by the United States supreme court's decisions that this Court has the right to reach an opposite result. We do not find these decisions so vague.

In the earliest of these cases, *Colegrove, supra,* which has been cited and relied on by the court majority as recently as 1957 (see *Kidd, supra*), the syllabus gives the following summary (p 549):

"Three persons who were qualified to vote in congressional districts of Illinois which have much larger populations than other congressional districts of that State, brought suit in a Federal district court in Illinois, under the declaratory judgment act, to restrain officers of the State from arranging for an election, in which members of congress were to be chosen, pursuant to provisions of an Illinois law of 1901 governing congressional districts. The complaint alleged that, by reason of later changes in population, the congressional districts created by the Illinois law lacked compactness of territory and approximate equality of population; and prayed a decree, with incidental relief, declaring the provisions of the State law invalid as in violation of various provisions of the Federal Constitution and in conflict with the reapportionment act of 1911, as amended. The district court dismissed the complaint. *Held,* dismissal of the complaint is affirmed."

In the *MacDougall Case,* relief was sought on the basis of the Fourteenth Amendment from an Illinois law requiring a petition from 25,000 voters, including a minimum of 200 from each of at least 50 of the 102 counties in the State, to form a new political party when 52% of the State's registered voters lived in Cook county alone. The majority of the court refused relief, saying (pp 283, 284):

"To assume that political power is a function exclusively of numbers is to disregard the practicalities

of government. Thus, the Constitution protects the interests of the smaller against the greater by giving in the senate entirely unequal representation to populations. It would be strange indeed, and doctrinaire, for this court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution—a practical instrument of government—makes no such demands on the States. . *Colegrove* v. *Green,* 328 US 549 (66 S Ct 1198, 90 L ed 1432), and *Colegrove* v. *Barrett,* 330 US 804 (67 S Ct 973, 91 L ed 1262)."

And in *Radford* v. *Gary,* 352 US 991 (77 S Ct 559, 1 L ed 2d 540), the supreme court, by *per curiam* opinion citing *Colegrove* v. *Green, supra,* affirmed a decision of a 3-judge court of the United States district court for the western district of Oklahoma in which that court had been asked to make the same sort of reappraisal of *Colegrove* which the instant case asks us to make. There, the majority opinion of the Federal district court (*Radford* v. *Gary,* 145 F Supp 541) said (p 544):

"Finally, we are asked to reappraise *Colegrove* and its successors in the light of the philosophy of the recent civil rights cases, . *Brown* v. *Board of Education of Topeka,* 347 US 483 (74 S Ct 686, 98 L ed 873, 38 ALR2d 1180); *Id.,* 349 US 294 (75 S Ct 753, 99 L ed 1083); *Bolling* v. *Sharpe,* 347 US 497 (74 S Ct 693, 98 L ed 884), wherein the supreme court is said to have adopted an entirely different concept of the transcendent effect of the equal protection clauses of the Fourteenth Amendment as applied to State political and social policies. There is nothing in the so-called civil rights cases indicating a

disposition to reverse, modify, or repudiate the rules so firmly established in the former cases, and it is not the function of this court to psychoanalyze the justices of the supreme court in order to divine the trend of decisions. It is sufficient that the supreme court has authoritatively spoken on the question before us, and we are bound until it speaks again.

"The motion to dismiss is sustained and the action is dismissed."

It should be noted that in the present case we are not asked, as were the Federal courts in the cases relied upon by petitioner (*Dyer* v. *Kazuhisa Abe* [Hawaii, 1956], 138 F Supp 220; *Magraw* v. *Donovan* [Minn, 1958], 163 F Supp 184), to restrain unequal and unlawful application of a State or territorial Constitution or law which guaranteed equal representation. In this case, we are asked to declare void a portion of the organic law of this State duly adopted by its people which, in its terms, provides for 1 senator for each constitutionally described senatorial district, which districts were substantially unequal in population at the time of the adoption of the amendment. In *Dyer, supra,* and *Magraw supra,* the organic law of the territory or State concerned required equality of representation. The Fourteenth Amendment was looked to only for equal application of the law.

Indeed, in the *Dyer Case,* this distinction was emphasized, with the court saying (p 236):

"We are not saying each citizen must always have the same vote. Political institutions may invoke geographic representation."

Nor is it accurate to say that the cases we have cited rest solely upon a reluctance of the Federal courts to intervene in a purely State problem. In the first place, our current problem is by no means purely a State one. The right asserted here is a

Federal right claimed to be found in the Federal Constitution.

Even more directly to the point, however, is the fact that in 2 of the cases cited (*Kidd, supra,* and *Anderson, supra*), the United States supreme court upheld decisions of State supreme courts which denied relief (requested on the basis of the Fourteenth Amendment) from unequal apportionment of State legislative districts. In the *per curiam* opinion in *Anderson,* the United States supreme court cited *Colegrove* and *MacDougall.* In the more recent *per curiam* opinion in *Kidd,* it cited *Colegrove* and *Anderson.* Any doubt about a court majority in *Colegrove,* or whether it applied to elections for State offices, is settled by these brief but definite opinions.

It seems beyond dispute that where, in the principal cases cited above, Fourteenth Amendment attacks did not serve to void reapportionment statutes which produced substantial inequality in spite of State constitutional mandates of equal apportionment, it may not be held to prohibit a State from producing similar results by affirmative constitutional provision therefor.

It hardly seems necessary to add that Michigan Supreme Court cases, wherein relief was granted against unequal apportionment statutes upon the basis of State constitutional mandates of equal apportionment,[2] became inapplicable to our present case when the equal apportionment provision in the State Constitution pertaining to the senate was removed by the 1952 constitutional amendment.

Nor may the right-to-vote cases involving Negro citizens be regarded as contrary precedent. *Nixon v. Herndon,* 273 US 536 (47 S Ct 446, 71 L ed 759); *Nixon v. Condon,* 286 US 73 (52 S Ct 484, 76 L ed

---

[2] *Board of Supervisors of Houghton County v. Secretary of State,* 92 Mich 638 (16 LRA 432); *Giddings v. Secretary of State,* 93 Mich 1 (16 LRA 402); *Williams v. Secretary of State,* 145 Mich 447.

984, 88 ALR 458); *Davis* v. *Schnell* (SD Ala), 81 F Supp 872, affirmed 336 US 933 (69 S Ct 749, 93 L ed 1093). The rights established therein were specifically mandated by the Fifteenth Amendment and are within the direct historic purpose of the Fourteenth. Further, the *Nixon Cases* preceded *Colegrove* and were discussed and distinguished therein, and the *Schnell Case* preceded the *Kidd, Radford,* and *Harts-field Cases.*

Actually, in no instance to this date has any court—State or Federal—held that the Fourteenth Amendment prohibits a State from establishing senate electoral districts by geographic areas drawn generally along county lines which result in substantial inequality of voter representation favoring thinly populated areas as opposed to populous ones, as Michigan has done in its Constitution. And we read the United States supreme court cases previously cited as controlling of our decision in this case and as requiring the dismissal of this writ.

2. In spite of United States supreme court precedent to the contrary, however, we are told that the issue here is really simple; that the Fourteenth Amendment guarantees equal protection of the laws; that, therefore, when a State adopts a voting provision which gives one man's vote greater weight than another's, an inequality results which is prohibited by the Fourteenth Amendment.

To date this argument has not yet successfully appealed to the majority of the United States supreme court. It also seems to ignore much of American history.

From the very founding of this republic, this nation has contained 2 diverse political forces—one of which has espoused pure democracy, and the other of which has sought to check it. There actually were 2 great compromises in the writing and the adoption of the Constitution itself without which indeed the

United States of America might never have come into being.

One of these was the conflict over the Bill of Rights. The Federalists thought them either unnecessary or undesirable. But those who were much concerned about pure democracy and individual liberty thought the first 8 Amendments to the United States Constitution so vital that they delayed ratification of the Constitution by the colonial legislatures until assured of the drafting and passage of the Bill of Rights. The Beards' Basic History of the United States, p 133 *ff*.

The other great compromise was arrived at in drafting of the Constitution. The Federalists succeeded in taking great powers from the States. In return, they had to give equal representation in the senate to all States regardless of size or population. Federalist Papers, No 62.[3] Substantial inequality of voting strength as to the United States senate was thus built into the Constitution long before the Fourteenth Amendment.

If, in our present case, this fact be distinguished as a compromise based upon historic conditions for which we find no parallel in Michigan, it is certainly difficult to distinguish similar legislative electoral provisions in the Constitutions of other States, both at the time of the adoption of the Fourteenth Amendment and subsequently.

The interpretation of the Fourteenth Amendment equal protection clause contended for herein would forbid any State from having a constitutional scheme for legislative representation in either house on any basis other than one which results in substantial voting equality.[4]

---

[3] Warren, The Making of the Constitution, p 267 *ff*.

[4] "It is plaintiff's basic contention, in short, that any discrimination, whether 'geographic' or otherwise, which in effect deprives him of substantial equality at the ballot box denies him of those rights guaranteed by the equal-protection-of-the-laws and due process clauses

No matter what the future may bring in relation to this contention, it certainly was not the interpretation of the Fourteenth Amendment placed thereon by the States which ratified it. Nor is it that adopted by the United States congress subsequently in admitting States to the Union. Nor is it the interpretation current among the majority of the 50 States of the Union at present.

We recognize, of course, that interpretations of the United States Constitution by any body other than the United States supreme court lack final authority. But the history of the time of adoption and the general understanding of the Amendment at that time and in subsequent history is relevant to any effort at interpretation. *Lockwood* v. *Commissioner of Revenue,* 357 Mich 517; *Bacon* v. *Kent-Ottawa Metropolitan Water Authority,* 354 Mich 159.

Of the 37 States in the Union in 1868, nine had constitutional provisions for election of representatives to at least 1 of the houses of their legislatures which based representation on constitutionally described legislative districts with constitutionally allocated representation without any pretense of guarantee of equality of popular representation. These States are Vermont, Rhode Island, Connecticut, New Hampshire, New Jersey, Delaware, Maryland, South Carolina, and Nevada.

The resulting disproportion in popular representation was in some instances far greater than that complained of herein. In the instances of Vermont, Connecticut, and Rhode Island (all States which ratified the Fourteenth Amendment), representation in 1 house was based upon a political unit, with geographic boundaries, known as a town or city.

As of the 1870 census, while the towns of Burlington and Victory in Vermont were each entitled to 1

of the Fourteenth Amendment to the United States Constitution." Plaintiff's brief, pp 20, 21.

representative[5] in the house, Burlington had a population of 14,387 while Victory had 263.[6] Thus, a vote in well-named Victory was worth more than 60 times that of a Burlington vote as to Vermont's house of representatives.

Rhode Island's constitution provided for the election of 1 senator from each town or city in the State.[7] The 1870 census shows Providence possessing a population of 68,904, while Jamestown had 378.[8] The ratio here was 182:1.

In Connecticut, the constitution in 1868 called for representation in the house, "the same as at present practiced and allowed."[9] Two representatives in the house were thus allocated to the towns of Hartford and Union.[10] Hartford as of 1870 had a population of 37,743, while Union had a population of 627.[11] Again, a ratio of 60:1.

Four of these States had, in relation to the senate, constitutionally prescribed representation by counties or by electoral districts (consisting of single counties, or groups of contiguous counties, or subdivisions of a single county), which resulted in substantial disproportion.

New Jersey's constitution called for 1 senator per county,[12] with a resulting ratio between Essex and Cape May counties as of 1870 of 17:1.[13]

Maryland's constitution,[14] and that of South Carolina,[15] also provided for 1 senator per county, regardless of population, except for Baltimore city

---

5 Vermont Const (1793), ch 2, § 7.
6 Compendium 9th Census (1870), p 351.
7 Rhode Island Const (1842), art 6, § 1.
8 Compendium 9th Census (1870), p 324.
9 Connecticut Const (1818), art 3, § 3.
10 Compendium 9th Census. (1870), pp 131, 132; 22 Conn Bar J (1948), p 136.
11 Compendium 9th Census (1870), pp 131, 132.
12 New Jersey Const (1844), art 4, § 2.
13 Compendium 9th Census (1870), p 74.
14 Maryland Const (1867), art 3, § 2.
15 South Carolina Const (1868), art 2, § 8.

(3 senators) and Charleston county (2 senators), respectively. 1870 ratios could be found approximating 9:1 in Maryland,[16] and 4:1 in South Carolina.[17]

In 1868 Nevada had a constitutional provision describing senate electoral districts and allocating senators thereto which was entirely comparable to that adopted by Michigan in 1952.[18] The districts consisted of single counties, or groups of counties, to which were allocated various numbers of senators, and 1 county which was allocated 4 senators. Based on these allocations, the 1870 census showed disproportionate ratios of as much as 4:1.[19]

In New Hampshire,[20] the constitutional provision in 1868 (and now) called for senate districts apportioned by amount of direct taxes paid.[21] In Delaware,[22] constitutional allocation of seats by county resulted in 1870 in over half of the population located in New Castle county electing only 3 senators out of a senate of 9.[23]

The remaining States in 1868 had constitutions which purported to call for some sort of legislative reapportionment by population. Many of these constitutions, however, also contained requirements or

---

[16] Compendium 9th Census (1870), p 215 and p 56.  *Cf.* Calvert county and Baltimore city.

[17] Compendium 9th Census (1870), p 88.  *Cf.* Chesterfield county and Charleston county.

[18] Nevada Const (1864), art 17, § 6.

[19] Compendium 9th Census (1870), p 72.  *Cf.* Esmeralda county and Storey county.

[20] New Hampshire Const (1783), pt 2, art 26.

[21] No figures are available to indicate what results, in terms of popular representation, were achieved in 1868 by the New Hampshire constitutional provision for apportionment of senate districts.  It is obvious, however, that the method employed was completely divorced from the principle of equality of popular representation.  Interestingly enough, however, New Hampshire, with the same principle in its constitution, is currently close to equality of popular representation. Baker, Rural versus Urban Political Power, p 17.

[22] Delaware Const (1831), art 2, § 3.

[23] Compendium 9th Census (1870), p 30.

restrictions which actually prevented any reapportionment based on substantial equality.

The commonest of these provisions was a requirement of a minimum number of representatives or senators (usually 1) per county (or parish), coupled with a maximum number of seats in the house concerned. In addition to States discussed above, 6 States had this kind of provision. These States were Alabama,[24] Georgia,[25] Kansas,[26] Louisiana,[27] New York,[28] and North Carolina.[29]

Another provision adversely affecting equality of popular representation in 1 house was a specific and disproportionate constitutional limitation upon the number of representatives from political subdivisions (usually counties) containing the largest populations. Such provisions existed in 1868 in 5 other States—Massachusetts,[30] Maine,[31] Missouri,[32] Florida,[33] and Pennsylvania.[34]

Without taking into account the major factor of disproportion occasioned by failure of legislatures to follow State constitutional commands to reapportion, or such relatively minor constitutional factors of disproportion as moiety clauses, it still appears that 20 of the 37 States constituting the Union at the time of the adoption of the Fourteenth Amendment had in their own constitutions provisions which prevented at least 1 legislative house from being based upon the principle of equality of popular representation.

[24] Alabama Const (1867), art 8, § 1.
[25] Georgia Const (1868), art 3, § 3.
[26] Kansas Const (1859), art 2, § 2; art 10, §§ 1, 2.
[27] Louisiana Const (1868), arts 20, 21.
[28] New York Const (1846), art 3, §§ 2, 5.
[29] North Carolina Const (1868), art 2, §§ 5, 6.
[30] Massachusetts Const (1780), ams 21, 22, of 1857.
[31] Maine Const (1819), art 4—pt 1st, §§ 2, 3.
[32] Missouri Const (1865), art 4, § 2.
[33] Florida Const (1868), art 4.
[34] Pennsylvania Const (1838), art 1, § 7 (am 1857 to § 7).

Between 1868 and the present time, 13 additional States have entered the Union.[35]

As a prerequisite to such entry, the US Const, art 4, § 3, requires congressional approval. Historically, congress has required States applying for admission to submit their proposed constitution. See *Coyle* v. *Smith,* 221 US 559 (31 S Ct 688, 55 L ed 853). Typical of the form of approval is the statute by which the constitution of the proposed State of Hawaii was approved and Hawaii was admitted:

"Sec. 1.   That, subject to the provisions of this act, and upon issuance of the proclamation required by section 7(c) of this act, the State of Hawaii is hereby declared to be a State of the United States of America, is declared admitted into the union on an equal footing with the other States in all respects whatever, and the constitution formed pursuant to the provision of the act of the territorial legislature of Hawaii entitled 'An act to provide for a constitutional convention, the adoption of a State constitution, and the forwarding of the same to the congress of the United States, and appropriating money therefor,' approved May 20, 1949 (Act No 334, Session Laws of Hawaii, 1949), and adopted by a vote of the people of Hawaii in the election held on November 7, 1950, is hereby found to be republican in form *and in conformity with the Constitution of the United States and the principles of the Declaration of Independence, and is hereby accepted, ratified, and confirmed.*   (Emphasis supplied.)    \*   \*   \*

"Sec. 3. The constitution of the State of Hawaii shall always be republican in form and shall not be repugnant to the Constitution of the United States and the principles of the Declaration of Independence."   73 Stat 4 (48 USCA 1959 Cum Supp, ch 3, p 74).

---

[35] We have treated Hawaii as admitted, although formally her Statehood does not take effect until July 4, 1960.

Of the 13 States whose constitutions were approved for admission, 8 such constitutions (for the States of Arizona,[36] Alaska,[37] Hawaii,[38] Idaho,[39] Montana,[40] New Mexico,[41] Oklahoma,[42] Utah[43]) contained provisions for election of at least 1 legislative house which fell into 1 of the 3 categories of disproportion discussed above.

Montana, for example (admitted 1889), required in its constitution the election of 1 senator per county.[44] The 1890 census showed Silver Bow county with 23,744, and Yellowstone county with 2,065[45]—a ratio of 11:1. ·

Arizona (admitted in 1912) provided in its constitution[46] for 2 senators from Cochise county with 34,591 by the 1910 census, and 1 senator from Mohave county with 3,733[47]—a ratio of 5:1.

The recently admitted States of Hawaii and Alaska offer further illustration of constitutionally provided substantial disproportion as will be detailed below.

Between 1868 and the present, disproportion of popular representation in State legislatures has increased markedly.  This has resulted from 3 major factors:  *first,* State constitutional provisions of the 3 categories previously cited; *second,* a tremendous population shift from rural to urban areas; and, *third,* a refusal on the part of many legislatures to reapportion even in the face of a State constitutional mandate demanding it.

---

36 Arizona Const (1910), art 4, pt 2, § 1(1).
37 Alaska Const (1956), art 6, §§ 2, 7; art 14, § 2.
38 Hawaii Const (1950), art 3, § 2.
39 Idaho Const (1890), art 3, §§ 2, 4; art 19, §§ 1, 2.
40 Montana Const (1889), art 5, § 4; art 6, §§ 4, 5.
41 New Mexico Const (1911), art 4, Apportionment section, following § 41.
42 Oklahoma Const (1907), art 5, § 10.
43 Utah Const (1896), art 9, §§ 2, 4.
44 See n 40, *supra,* art 6, § 5.
45 Compendium 11th Census (1890), p 29.
46 See n 36, *supra,* art 4, § 21(1).
47 Compendium 13th Census (1910), p 32.

Again omitting the third factor, pertaining to legislative failure to reapportion,[48] we find that 27 States, a majority of the present 50 States, have constitutionally prescribed inequality of representation in at least 1 legislative house.

Fourteen States now have constitutional provisions as to 1 house which make no pretense of basing representation on population or vote equality.[49] The ratios of disproportion in many of these States have increased enormously.

Thus Connecticut and Vermont retain representation in the house by towns,[50] with extreme instances of disproportion now exceeding 600:1.[51]   Similarly, New Jersey retains a constitutional provision for 1 senator per county.   The disproportion between the largest and smallest counties is now 26:1.[52]

Arizona, Idaho, New Mexico, South Carolina, Nevada, and Montana also have a uniform number of senators for each county,[53] resulting in 1950 in ratios

[48] Failure to reapportion is generally regarded as occasioning more serious inequalities than affirmative State constitutional provisions. Lewis, Legislative Reapportionment and the Federal Courts, 71 Harv L Rev 1057, 1060.

[49] Connecticut Const (1955), art 3, § 3.
Vermont Const (1793), am 1924, ch 2, § 13.
New Jersey Const (1947), art 4, § 2(1).
Arizona Const (1912), art 4, pt 2, § 1(1).
Idaho Const (1890), art 3, § 2.
New Mexico Const (1911), am 1949, art 4, § 3.
Nevada Const (1864), am 1950, art 4, § 5.
. Montana Const (1889), art 5, § 4; art 6, §§ 4, 5.
Delaware Const (1897), art 2, § 2.
Maryland Const (1867), am 1956, art 3, § 2.
Illinois Const (1870), am 1954, art 4, § 6 (1959 Cum Supp).
Alaska Const (1956), art 6, §§ 2, 7; art 14, § 2.
Hawaii Const (1950), art 3, § 2.
South Carolina Const (1895), art 3, § 6.

[50] See n 49, *supra*.

[51] *Cf.* Union 261, Hartford 177,397.  Rand McNally Commercial Atlas and Marketing Guide (90th ed, 1959), pp 101, 102.  The Rand McNally figures are taken from the 1950 US Bureau of the Census tables.

[52] *Cf.* Sussex county 34,423, and Essex county 905,949.  *Ib*, Rand McNally, p 293.

[53] See n 49, *supra*.

of 39 :1 ;[54] 77 :1 ;[55] 48 :1 ;[56] 18 :1 ;[57] 82 :1 ;[58] and 54 :1,[59] respectively.

Delaware and Maryland have constitutionally specified representation in the senate by districts described along county or city lines.[60] In Delaware, in 1950, the smallest county, Kent, had 37,870 population and was allocated 5 senators, while the largest county, New Castle, had 218,879 and only 7 senators.[61]

In Maryland, in 1950, the city of Baltimore had a constitutional allocation of 6 senators and a population of 949,708, where the smallest county in the State, Kent, had 1 senator for a population of 13,677.[62]

Three States have recently adopted constitutional provisions as to their State senators (quite comparable to the Michigan amendments of 1952) which eliminate any requirement of popular apportionment, provide for specific senatorial districts, and which result in substantial inequality of representation.

A 1954 constitutional amendment in Illinois allocated 24 of the 58 senate seats to Cook county,[63] although Cook county contained 52% of the State population. Thirty-four seats were reserved for 48% of the population.[64]

---

[54] *Cf.* Mohave county 8,510, and Maricopa county 331,770. *Ib,* Rand McNally, p 63.

[55] *Cf.* Clark county 918, and Ada county 70,649. *Ib,* Rand McNally, p 135.

[56] *Cf.* Harding county 3,013, and Bernalillo county 145,673. *Ib,* Rand McNally, p 303.

[57] *Cf.* McCormick county 9,577, and Greenville county 168,152. *Ib,* Rand McNally, p 393.

[58] *Cf.* Esmeralda county 614, and Washoe county 50,205. *Ib,* Rand McNally, p 281.

[59] *Cf.* Petroleum county 1,026, and Yellowstone county 55,875. *Ib,* Rand McNally, p 267.

[60] See n 49, *supra.*

[61] *Ib,* Rand McNally, p 214.

[62] *Ib,* Rand McNally, p 209.

[63] See n 49, *supra.*

[64] *Ib,* Rand McNally, p 141.

The recent congressionally approved constitutions of the new States of Alaska and Hawaii contain State senatorial provisions which call for specific districts described largely on a geographic basis,[65] with a resulting substantial inequality of popular representation. In Alaska, the newly elected State senator from the Anchorage-Palmer district represents 87,748 constituents, as compared with the senator from Barrow-Kobuk who represents only 5,705[66]—a ratio of 15:1.

Any thought that the *Dyer* v. *Kazuhisa Abe Case, supra,* achieved equality of representation in both houses of the Hawaii legislature, either before or after Statehood is illusory. The *Dyer Case* dealt with the refusal of the Hawaiian legislature to reapportion the seats in the house and the senate as required by the terms of the Hawaiian organic act (48 USC [1958 ed], § 562)—the organic law of the territory.

The *Dyer* opinion was written in a Federal district court case which granted no relief other than to deny a motion to dismiss. It was decided February 10, 1956. On the heels of this decision, congress amended the Hawaiian organic act on August 1, 1956 (70 Stat 907, ch 851, § 7), to require reapportionment of the house by the governor in terms of equality of popular representation (48 USC [1958 ed], § 562). But the same amendment increased the senate from 15 to 25 members, eliminated all requirement of reapportionment or equality of representation, specified senate electoral districts generally along the lines of previously existing counties (48 USC [1958 ed], §§ 568, 569), and so allocated the 25 seats among the designated districts as to maintain

---

[65] See n 49, *supra.*

[66] Press release US Dept. of Commerce May 16, 1960, entitled, Preliminary Election District Totals for Alaska, 1960 Census of Population.

a gross inequality greatly favoring the more thinly populated districts as opposed to populous Oahu. The very same disproportion has been carried into the senate in the recently drafted and congressionally approved State constitution.[67] Thus, in the senate of the new State of Hawaii, the island of Oahu with 79% of Hawaiian population will elect 10 senators, while 21% of the population on the "neighbor islands" will elect 15 senators.[68]

The senatorial districts, incidentally, are drawn along lines of previously existing counties, except for the county of Honolulu which is divided into 2 senate districts.

The second category (consisting of States whose constitutions pay lip service to reapportionment, but likewise contain requirements which negate equality) presently contains the 7 States of Alabama,[69] Kansas,[70] Louisiana,[71] New York,[72] North Carolina,[73] Utah,[74] and Mississippi.[75] These constitutions require as to 1 legislative house at least 1 representative or senator without regard to population while likewise providing a maximum number of seats.[76] All of these are listed in a study of State legislative representation,[77] as having serious imbalance in favor of rural areas as opposed to urban areas.

---

[67] See n 49, *supra*.
[68] *Cf.* Honolulu county 449,910, and remaining counties 135,115. US Dept. of Interior, Hawaii, 1959, p 10.
[69] Alabama Const (1901), art 4, § 50; art 9, §§ 198, 199, 201, 202.
[70] Kansas Const (1859), art 2, § 2 (adopted 1873); art 10, §§ 1, 2, 3.
[71] Louisiana Const (1921), art 3, §§ 2, 5, 6.
[72] New York Const (1894, as am 1937, 1945), art 3, §§ 2–4.
[73] North Carolina Const (1868, am 1872), art 2, § 5.
[74] Utah Const (1896), art 9, §§ 2–4.
[75] Mississippi Const (1890), art 13, §§ 254–256.
[76] Kansas, *supra*, n 70, is a slight exception in that 250 legal votes must have been cast in a county to entitle it to 1 member in the house of representatives.
[77] Baker, Rural versus Urban Political Power, pp 16, 17.

In the third category (consisting of States with reapportionment provisions, but with an arbitrary maximum limitation upon counties or districts with the largest populations), we find 6 States, California,[78] Florida,[79] Georgia,[80] Oklahoma,[81] Rhode Island,[82] and Texas.[83] The imbalance in these States between urban and rural voters favoring the latter is even more severe than in relation to the States in the second category.[84]

California will serve to illustrate the disproportion which can result. The California constitution provides that no county can have more than 1 senator. It also provides a maximum of 3 as the number of counties which can be grouped to form a single senatorial district.[85] The result is that Los Angeles county has 1 senator for 4,151,687 people, while the 28th senatorial district (consisting of Mono, Inyo, and Alpine counties) has 1 senator for 14,014 people.[86] The ratio is 296:1.

Thus a majority of the States of the Union in 1868, a majority of the States which joined the Union subsequently, and a majority of the States at the present time, had, or have, in their constitutions provisions as to 1 legislative house which have the effect of denying substantial equality of voting strength to some voters (generally in more populous areas), as compared to other voters (generally in thinly populated areas).

Many, if not most, of such provisions in other States are directly comparable in constitutional

---

[78] California Const (1879), am 1926, 1942, art 4, § 6.

[79] Florida Const (1885), am 1924, art 7, § 3.

[80] Georgia Const (1945), art 3, § 3, pars 1, 2.

[81] Oklahoma Const (1907), art 5, § 10.

[82] Rhode Island Const (1842), art 6, § 1, as amended by art 19 (1928).

[83] Texas Const (1876), art 3, §§ 2, 25, 28.

[84] Baker, Rural versus Urban Political Power, p 16.

[85] See n 78, *supra.*

[86] *Ib*, Rand McNally, p 77.

principle and resulting disproportion to the 1952 amendments to Michigan's Constitution.

What the 1952 amendments did was to draw senatorial electoral districts based on geographic areas described in terms of counties, or groups of contiguous counties, or subdivisions of a single county. As we have seen, this has many parallels in the history of other States from the time of the adoption of the Fourteenth Amendment down to date. The system employed appears to be a variation of the 1-senator-per-county system which is common to many other States.

We note the suggestion that the 1-senator-per-county system may be a constitutional classification where the variation is not. We reject this reasoning, however. The 1-senator-per-county system would in Michigan produce ratios of disproportion exceeding 1,000:1. We do not think the Fourteenth Amendment may be regarded as forbidding a variation from the 1-per-county system in the direction of popular representation.

The real attack upon the classification of Michigan voters resulting from the 1952 senate amendments, however, is upon its purpose and its result. It seems clear to us that the general purpose of the disproportionate constitutional provisions which we have reviewed was, and is, to seek to give more thinly populated areas of a State a specific check upon the concentrated political power of the more populous areas. Considering that the amendment with which we deal in this case was adopted at an election wherein another amendment (Proposal No 2), designed to provide equality of popular representation in the Michigan senate was defeated, it seems clear that this likewise was the purpose of the majority of Michigan voters in 1952.[87]

This Court does not determine the wisdom of the

---

[87] Michigan Manual 1953, 1954, pp 461, 462.—REPORTER.

decisions made by the people of Michigan in adopting their Constitution. By its terms, all political power is inherent in them (Mich Const [1908], art 2, § 1), subject only, of course, to the United States Constitution.

However distasteful to some of us the rationale of the majority of voters in 1952 may be as support for the classification of senatorial districts which resulted from the 1952 amendment, it clearly has been regarded to date as acceptable under the United States Constitution by the United States supreme court.

The United States supreme court, in a case in which the classifications in a tax statute and ordinance were attacked as violative of the equal protection clause of the Fourteenth Amendment, established this test as to classification:

"Equal protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary. *Cf. Dominion Hotel, Inc.,* v. *Arizona,* 249 US 265 (39 S Ct 273, 63 L ed 597); *Great Atlantic & Pacific Tea Co.* v. *Grosjean,* 301 US 412 (57 S Ct 772, 81 L ed 1193, 112 ALR 293); *New York Rapid Transit Corp.* v. *City of New York,* 303 US 573 (58 S Ct 721, 82 L ed 1024); *Skinner* v. *Oklahoma, ex rel. Williamson,* 316 US 535 (62 S Ct 1110, 86 L ed 1655)." *Walters* v. *City of St. Louis,* 347 US 231, 237 (74 S Ct 505, 98 L ed 660).

In *MacDougall, supra,* the court said (p 284):

"It would be strange indeed, and doctrinaire, for this court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper

diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former."

In the face of this history and this precedent, we find no way by which we can say that the classification we are concerned with herein is "wholly arbitrary," and hence repugnant to the Fourteenth Amendment of the United States Constitution as the United States supreme court has construed it to this date.

3. These are cold words with which to greet a plea for equality of voting rights which has at least a kinship with the Declaration of Independence. Nor do we believe that the final chapter has been written in the struggle between those who would fully embrace the principle of equality of man and those who would hold it in check.

Nearly a century, a great civil war, and 3 constitutional amendments intervened between that Declaration and the end of its most manifest contradiction in American life—the institution of slavery.

Neither the words of the Declaration, nor those of the Fourteenth Amendment, served to grant women the equal right to vote. It took years of popular agitation and the Nineteenth Amendment to achieve this.

And only recently, after nearly 2 centuries, has the notion that all men are created equal been translated into a prohibition against legally enforced racial segregation. *Brown* v. *Board of Education of Topeka*, 347 US 483 (74 S Ct 686, 98 L ed 873, 38 ALR2d 1180).

While 2 of these changes were achieved by great social movements which resulted in constitutional amendment, the last was achieved by an interpre-

tation of the Fourteenth Amendment which may never have been considered by its authors, and which certainly had a great weight of precedent against it.

We recognize, as petitioner asserts, that the Constitution is not a static document.

In *Weems* v. *United States,* 217 US 349 (30 S Ct 544, 54 L ed 793), the supreme court said (pp 373, 374):

"Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice Marshall, 'designed to approach immortality as nearly as human institutions can approach it.' The future is their care and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be. Under any other rule a constitution would indeed be as easy of application as it would be deficient in efficacy and power. Its general principles would have little value and be converted by precedent into impotent and lifeless formulas. Rights declared in words might be lost in reality. And this has been recognized. The meaning and vitality of the Constitution have developed against narrow and restrictive construction. There is an example of this in *Cummings* v. *State of Missouri,* 4 Wall (71 US) 277 (18 L ed 356), where the prohibition against *ex post facto* laws was given a more extensive application than what a minority of this court thought had been given in *Calder* v. *Bull,* 3 Dall (3 US) 386 (1 L ed 648). See, also, *Ex parte Garland,* 4 Wall (71 US) 333 (18 L ed 366). The construction of the Fourteenth Amendment is also an example for it is one of the limitations of the Constitution. In a not unthoughtful opinion Mr. Justice Miller expressed great doubt

whether that Amendment would ever be held as being directed against any action of a State which did not discriminate 'against the Negroes as a class, or on account of their race.' *Slaughterhouse Cases,* 16 Wall (83 US) 36, 81 (21 L ed 394). To what extent the Amendment has expanded beyond that limitation need not be instanced."

And in *Brown, supra,* the court said (pp 492, 493):

"In approaching this problem, we cannot turn the clock back to 1868 when the [Fourteenth] Amendment was adopted, or even to 1896 when *Plessy* v. *Ferguson* [163 US 537 (16 S Ct 1138, 41 L ed 256)] was written. We must consider public education in the light of its full development and its present place in American life throughout the nation. Only in this way can it be determined if segregation in public schools deprives these plaintiffs of the equal protection of the laws."

To those to whom the essence of democracy is equality of voting rights, this case poses an unsolved issue of tremendous importance. Buried deep in the body politic of America is the conflict over minority rural control of, or veto power in, State legislatures as a result of affirmative State constitutional discrimination or of failure to reapportion legislative seats in accordance with the shift of population to the cities. Lewis, Legislative Apportionment and the Federal Courts, 71 Harv L Rev 1057 (1958); Tabor, Gerrymandering of State and Federal Legislative Districts, 16 Md L Rev 277 (Fall, 1956); Constitutional Right to Congressional Districts of Equal Population, 56 Yale LJ 127 (1946); Strout, Richard Lee, The Next Election is Already Rigged (Harpers, Nov., 1959).

It may well be that the relative abdication of State influence in resolving the great urban problems of our day (slum clearance, urban redevelopment, unemployment, and social security, to name a few) is

largely due to the restrictions upon pure democracy thus built into the governmental structures of the States. Thus, ironically, those who have advocated State's rights, along with checks on popular democracy, have by indirection aided in thrusting added responsibility upon the Federal government.

The shift of population to the metropolitan areas has not ceased. From a nation 95% rural in 1790, we have changed to one 64% urban in 1950.[88] It is impossible to predict how far this migration may go toward creating even greater denial of responsive democracy in State legislatures as presently elected.

The people, of course, have the power to solve the problem either by piecemeal amendment of their State constitutions[89] or by amendment to the United States Constitution. The difficulty of these solutions is obvious.

Possibly, too, this problem may represent the next great area of legal debate in the progress of America toward equality. The case for the interpretation of the Fourteenth Amendment as a prohibition against discrimination directed toward urban voters has been most eloquently stated by Justices Black and Douglas in their dissents in the *Colegrove* and *MacDougall Cases.*

These dissents stand in sharp contrast to the reasoning of the majority of the supreme court in the *MacDougall Case* which we have quoted and which we have held to be controlling of our current decision. It is obvious that the *MacDougall* reasoning has behind it a great weight of history and precedent. It is equally obvious that this reasoning cannot be reconciled with any concept of pure democracy.

---

[88] Taeuber and Taeuber, The Changing Population of the United States (1958), p 112 *et seq.*

[89] In Michigan, amendment of the State Constitution requires a simple majority vote of those voting on the proposition. Art 17, §§ 1, 2, 3.

We recognize that these dissents may ultimately prove prophetic. But the fact that they are quoted and relied on so frequently in the argument before us serves chiefly to remind us that the essence of petitioner's case has been effectively presented, thoroughly considered and rejected in the court of final decision in the cases we have cited.

If the answer to this problem is to be found in terms of judicial decision, it is one of vast national impact and it requires the reversal of much prior United States supreme court precedent. Plainly, this Court is bound by existing United States supreme court precedents to the contrary until and unless the majority of that court becomes convinced that this new advance toward equality is one of "the felt necessities of the time."[90] This decision, and its timing, are for that court.

It would ill behoove the Supreme Court of Michigan (particularly at the juncture of history following the great decision in *Brown* v. *Board of Education of Topeka, supra*) to claim the right to an independent interpretation of the Constitution of the United States.

4. No other meritorious question is presented.

For the reasons given, the petition for writ of mandamus is dismissed. No costs, a public question being involved.

Black, J. (*concurring*).

"You *do* have a Federal constitutional right, but you just *don't* have any remedy!"

Judge Wallace, writing rebelliously in the twin case of *Radford* v. *Gary* (WD Okla), 145 F Supp 541, 547 (affirmed 352 US 991 [77 S Ct 559, 1 L ed 2d 540]), so characterized the way complainant Radford was turned out of court. Sympathizing with

---

[90] Oliver Wendell Holmes, The Common Law, p 1 (1881).

the judge's reasons for dissent in the *Radford Case,* I am nevertheless convinced that we must—in this case— make the same "paradoxical pronouncement"; that the plaintiff has a constitutional right but no remedy.   Admittedly, in a case which supposedly is governed by equitable principles, this stultifies our great maxims: "Equality is equity"—"Equity will not suffer a wrong without a remedy."   And it is to say in so many words that the courts, when faced and challenged by a gross political violation of the equality clause, have neither the power nor the authority "to preserve the integrity of the Fourteenth Amendment."

This  case  cannot  be  decided  on  non-Federal ground.   The decisive question is whether the 1952 amendments of article 5 of our Constitution justiciably offend the plaintiff's right to equality, of representative value of his vote, as apparently guaranteed by the Fourteenth Amendment.   The mentioned amendments have modified, to the extent of manifest conflict, Michigan's original guaranty of equal protection of the laws (Constitution 1908, article 2, § 1).   Hence "the earlier provision must yield to the later" (*Thoman* v. *City of Lansing,* 315 Mich 566, 579; followed by the writer and Justices Smith and Voelker in *Graham* v. *Miller,* 348 Mich 684, 697).[1]   The result is that Michigan's Constitution authorizes no relief—in fact it denies the relief said article 2 otherwise provides—in this latest of cases where due showing has been made of flagrant discrimination against citizens in the exercise of their political rights.

Once, prior to adoption of such amendments, relief in these cases was freely granted (*Williams* v. *Secretary of State,* 145 Mich 447; *Giddings* v. *Secretary*

---

[1] My reasons for holding that this Court cannot examine, now, the procedures by which the 1952 amendments were submitted to and adopted by the people, appear in the *Graham Case.*

·of State, 93 Mich 1 [16 LRA 402]). Now we are
powerless to act unless this State Court, seated to
decide the presented Federal question, is jurisdic-
tionally authorized to decree that the supremely au-
thoritative "pledge of the protection of equal laws"
(Yick Wo v. Hopkins, 118 US 356, 369 [6 S Ct 1064,
30 L ed 220]) overcomes the crescently iniquitous
and discriminatory effect of local constitutional pro-
visions such as confront us here.

*First: The Federal Question.*

*Colegrove* v. *Green*, 328 US 549 (66 S Ct 1198, 90
L ed 1432); *MacDougall* v. *Green*, 335 US 281 (69
S Ct 1, 93 L ed 3); and *South* v. *Peters*, 339 US 276
(70 S Ct 641, 94 L ed 834), were written into the
juridical scroll a decade and more ago. Since then,
as in the case of Terry's last order to Custer, every
penstroke in each of the 3 cases has been analyzed
and assized by eminent experts. Yet the interpretive
war rages on—all over the country—without visible
abatement. This is made doubly clear by the excel-
lent briefs of the parties before us.

For myself, there is no difficulty. Reading all 3
cases with compared and contemplative care, I can
only conclude that the supreme court has compulsive-
ly advised all courts of the land that the Fourteenth
Amendment, insofar as it calls for equality among
citizens in the exercise of their voting rights, im-
poses an obligation which depends for its bidding
solely upon legislative or political action. In such
regard the Federally declared right to equal protec-
tion is like the guarantee by article 4 of "a repub-
lican form of government," that is to say, it is not
enforcible in the courts.

Assuming as they obey that judges of subordinate
courts have a right to speak their views (see for
example *Colegrove* v. *Green* (ND Ill), 64 F Supp
632, 634; *Baker* v. *Carr* (MD Tenn), 179 F Supp 824,

828), I respectfully suggest that the dissenters were right in all 3 of the above cited cases. Some day, inevitably, the supreme court will authorize justiciable employment of the equality clause in cases of present political nature. But that day has not yet arrived.

Already, in this swiftly advancing second half of the Twentieth Century, it becomes more and more apparent that the law, while it "must be stable," cannot "stand still."

"Sooner or later, if the demands of social utility are sufficiently urgent, if the operation of an existing rule is sufficiently productive of hardship or inconvenience, utility will tend to triumph. 'The view of the legal system as a closed book was never anything but a purely theoretical dogma of the schools. Jurisprudence has never been able in the long run to resist successfully a social or economic need that was strong and just.' " The Growth of the Law, Cardozo, pp 117, 118.

The times now exert progressively greater pressure on the courts to employ—in more and more types of cases—the great principles of equality one finds in the maxims of equity and the mandates of the National Constitution and of most State constitutions.[2] Equity's greatest—and sore needed—period of service to the law lies immediately ahead. So does that of the equality clause. Nonetheless, in cases where a "political thicket" becomes the thorny path to equal protection, the Federal courts

[2] "It may take a 'rotten-borough' condition much worse than now prevails in most of our States, a dramatic sitdown strike of urban taxpayers, an unexpected new judicial attitude of willingness to come to grips with the situation, or an increased awareness of citizens to the grave consequences of failure to provide a truly representative assembly, to provide the necessary impetus to action on this problem." Professor Short, of the University of Minnesota, writing under the title "Legislative Reapportionment" in 17 Law and Contemporary Problems (Duke Univ School of Law), p 385.

—and that for the present case includes this Court— are not yet ready to move.

The question being exclusively one for vanguard determination by supreme authority, we have no power of re-examination of precedents as in local cases, and no right as a presently inferior court "to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant" (Judge Learned Hand, dissenting in *Spector Motor Service* v. *Walsh* [CCA 2], 139 F2d 809, 823). Which is to suggest, in a parenthetically light aside, that Judge Hand's pointed and ultimately honored epigram (see *Spector Motor Service* v. *McLaughlin,* 323 US 101 [65 S Ct 152, 89 L ed 101]), must have been written with the trenchant "seeds of time" passage from Macbeth in mind. That passage I now repeat to my cherished Brethren as they continue to tug and sweat over the construction, declination, and punctuation of the majority opinions of *MacDougall* and *South:*

> "If you can look into the seeds of time,
> And say which grain will grow and which
> will not,
> Speak then to me, who neither beg nor fear
> Your favors nor your hate."  (Act 1, sc 3.)

Yes, each opinion reported in *Colegrove, MacDougall,* and *South* is a planted seed of time. But no man or group of men assembled at our conference table can say—in terms of a judgment or decree of this Court—which of the grains will grow, and which will not. We lack the authority as well as the ability so to do.

*Second: The Position of a State Court with Respect to a Decisive Federal Question.*

It is said with considerable force that *Colegrove, MacDougall,* and *South* are controlling directives ad-

dressed solely to subordinate Federal courts, and that they do not govern the jurisdiction or the powers of State courts. I disagree, so far as concerns the case at bar.

Writing in previous cases, I have recognized the continuing obligation of this Court, "equally with the courts of the Union," to guard and enforce every right secured by the National Constitution whenever such right or rights are properly asserted here (*Connor* v. *Herrick,* 349 Mich 201, 206; *New York Central R. Co.* v. *Detroit,* 354 Mich 637, 665). *Robb* v. *Connolly,* 111 US 624 (4 S Ct 544, 28 L ed 542) (followed in *Plaquemines Tropical Fruit Co.* v. *Henderson,* 170 US 511 [18 S Ct 685, 42 L ed 1126]; *Mooney* v. *Holohan,* 294 US 103 [55 S Ct 340, 79 L ed 791, 98 ALR 406]; *United States* v. *Bank of New York & Trust Co.,* 296 US 463 [56 S Ct 343, 80 L ed 331], and *Irvin* v. *Dowd,* 359 US 394[ 79 S Ct 825, 3 L ed 2d 900]), sufficiently indicates our continuing responsibility in such regard. In *Plaquemines* the court quoted Hamilton from the Federalist, ending as follows (pp 515, 516 of report):

"When in addition to this we consider the State governments and the National government as they truly are, in the light of kindred systems and as parts of one whole, the inference seems to be conclusive that the State courts would have a concurrent jurisdiction in cases arising under the laws of the Union, where it was not expressly prohibited."

This concurrent obligation works—in the State courts as in the Federal courts—both ways. Any defendant who interposes a Federal right in bar of relief sought on Federal ground is entitled, equally with his opponent, to a judicial determination that one or the other of such asserted rights is decisive. Here the petitioner appeals for relief under the Fourteenth Amendment by due pleading and con-

vincing proof of invidious discrimination; discrimination effected by the 1952 amendments before us. Standing against the grant of such relief all defendants allege and rely upon another Federal right; that of power of a State to discriminate politically—as here—without *justiciable* offense to the Fourteenth Amendment.[3] Thus the respective contenders insist on contradictory Federal rights.

It is the duty of this Court to resolve such questions under the exclusive guidance of authoritative decisions of the supreme court. As said in *South Carolina* v. *Bailey*, 289 US 412, 420 (53 S Ct 667, 77 L ed 1292), it is our function "to administer the law prescribed by the Constitution * * * of the United States, as construed by this [United States supreme] court." I have proceeded and shall proceed on that fundament.

The Fourteenth Amendment assays no richer in the State courts than in the courts of the United States. If on corresponding submission of this case —in one of the courts of the Union[4]—the Fourteenth Amendment would not serve to authorize equitable relief, then it provides no ground for relief here. The reason is that our jurisdiction on proper presentment of a Federal right is coextensive and coterminous with that of the Federal courts. We sit in these cases as a court of jurisdiction concurrent with that of the inferior Federal courts; literally as a court of the United States. We have the authority to grant relief on strength of a right advanced under national laws *when and only when an inferior Federal court could and would do so on a similar presentation.*

---

[3] The answer of defendants is that of the defendants in *Colegrove,* quoted as follows:

"Defendants' answer is expressed briefly and tersely. 'Granted— What of it?'" (64 F Supp 632, 633).

[4] Say, before a 3-judge Federal court convened at Detroit.

The leading case dictating this conclusion is *Claflin* v. *Houseman,* 93 US 130 (23 L ed 833), from which the following is taken (p 137):

"The fact that a State court derives its existence and functions from the State laws is no reason why it should not afford relief; because it is subject also to the laws of the United States, and is just as much bound to recognize these as operative within the State as it is to recognize the State laws. The two together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two jurisdictions are not foreign to each other, nor to be treated by each other as such, but as courts of the same country, having jurisdiction partly different and partly concurrent."

Of *Claflin* the supreme court more recently has said (*Testa* v. *Katt,* 330 US 386, 390, 391 [67 S Ct 810, 91 L ed 967, 172 ALR 225]):

"The opinion of a unanimous court in that case was strongly buttressed by historic references and persuasive reasoning. It repudiated the assumption that Federal laws can be considered by the States as though they were laws emanating from a foreign sovereign. Its teaching is that the Constitution and the laws passed pursuant to it are the supreme laws of the land, binding alike upon States, courts, and the people, 'any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' It asserted that the obligation of States to enforce these Federal laws is not lessened by reason of the form in which they are cast or the remedy which they provide."[5]

---

[5] To same effect see *Blythe* v. *Hinckley,* 180 US 333 (21 S Ct 390, 45 L ed 557), and *Second Employers' Liability Cases,* 223 US 1 (32 S Ct 169, 56 L ed 327). In *Blythe* this passage appears (p 338):

"The State courts had concurrent jurisdiction with the circuit courts of the United States, to pass on the Federal questions thus intimated, for the Constitution, laws and treaties of the United States are as much a part of the laws of every State as its own local laws and constitution."

All this considered in sum, it must be said that a State court cannot grant relief on pleading and proof of an invidious and otherwise actionable violation of the equality clause unless . on correspondingly proper pleading and proof an inferior court of the Union could and should do so.  This is the order of *the* Constitution.  It is addressed to us by the second division of the Sixth Article.

*Third: MacDougall, in Particular, Determines the Merits of Today's Constitutional Question.*

*MacDougall* holds, in *per curiam* form (pp 283, 284):

"To assume that political power is a function exclusively of numbers is to disregard the practicalities of government.  Thus the Constitution protects the interests of the smaller against the greater by giving in the senate entirely unequal representation to populations.  It would be strange indeed, and doctrinaire, for this court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former.  The Constitution—a practical instrument of government—makes no such demands on the States."

I am not alone in accepting this as meritoriously authoritative.  Professor Corwin, writing in pursuance of "Senate Joint Resolution 69" the "Constitution of the United States of America" (United States Government Printing Office, 1953), analyzes *Colegrove* first on page 548 of the volume.  Then he turns to *MacDougall* and writes, of the majority opinion:

"In *MacDougall* v. *Green,* however, the court seemed to regard as justiciable the question of the validity of the provision of the Illinois election code requiring that a petition for the nomination of candidates of a new political party be signed by 25,000 voters including at least 200 from each of at least 50 of the State's 102 counties, *for it went on to sustain the provision in a brief per curiam opinion.*" (Emphasis supplied.)

And Professor Kauper, of the Law School of the University of Michigan,[6] views *MacDougall* in his "Cases and Materials on Constitutional Law" (Prentice-Hall, 1954), this way: "Language used in the *per curiam* opinion indicates that the decision was on the merits of the constitutional question." (p 60.)

But recently the 3-judge court assembled to hear *Baker* v. *Carr* (MD Tenn), 179 F Supp 824, concluded as I conclude (p 828):

"With the plaintiffs' argument that the legislature of Tennessee is guilty of a clear violation of the State constitution and of the rights of the plaintiffs the court entirely agrees. It also agrees that the evil is a serious one which should be corrected without further delay. But even so the remedy in this situation clearly does not lie with the courts. It has long been recognized and is accepted doctrine that there are indeed some rights guaranteed by the Constitution for the violation of which the courts cannot give redress."

Much though we may be impressed by the searching and—as I view them—presciently written minority opinions of Justices Black and Douglas (in *Colegrove, MacDougall,* and *South*), I find myself unable to conclude other than as asserted by the present defendants, that is to say, the last word from the supreme court is that a State may—unfettered

---

[6] Author of "Frontiers of Constitutional Liberty" (1956).

juridically by the Fourteenth Amendment—determine what as a matter of State policy shall be "a proper diffusion of political initiative" as between the thinly and heavily populated areas of the State. So terminates our proper inquiry, likewise our jurisdictional function, in this case.

*Fourth: The Argument "In Terrorem".*

I write from this point for the future and its contingencies. This indeed may be the case (or one of the cases) where dissenting opinions of the past are due to become nationally supreme law. We cannot foretell, of course, yet should prepare now for the event should it occur. I would, then, dispose now of defendants' fearsome argument, confronting us as in all like cases, that any present grant of relief would result in legal and political chaos throughout the State and partial destruction of the State government.

If this Court were possessed of authority to rule, and had duly decided to rule, that the amendments in question offend and so fall before the equality clause, the immediate result of our judgment and decree would simply be that of prospective reinstatement of original sections 2 and 4 of said article 5 (Const 1908). Courts of equity, determined to do justice and to prevent disruption and uncertainty (the recent "desegregation cases" are an example), can and presumably will shape their decrees to the needs of the case at hand. We have said so as concerns our own jurisdiction (*Herpolsheimer* v. *A. B. Herpolsheimer Realty Co.,* 344 Mich 657, 665), and so it would be in the hypothesized event.

Let the supreme court loan the Fourteenth Amendment to the State courts—for employment in cases where the constitution or laws of a State create and insure gross inequality of voting power of citizens—, and those courts will experience little difficulty in

working out as needed a continuing general observance of the equality clause. There will be no devastation or ruination of Michigan, if on possible review of this case the 1952 amendments are held invalid. This frightful picture of impending desolation is "for the most part a figment of excited brains."[7] (Politically excited, I must add.) We can, if authorized to proceed, control the effect of our decree or decrees so that transition becomes orderly, making this provision effective prospectively, that one effective retrospectively, others effective instanter, all as proof and indicated adjustment may require. See, in such procedural regard, *Certain-Teed Products Corporation* v. *Paris Township,* 351 Mich 434; *Ib.,* 355 Mich 302; and *Brown* v. *Board of Education of Topeka,* 347 US 483, 495, 496 (74 S Ct 686, 98 L ed 873, 38 ALR2d 1180).

*Fifth: The Merits as Discussed in Other Opinions.*

No one expects that mathematical nicety of voting equality can be worked out or ever would be effected by the election laws of a State. Reasonable latitude has always been allowed for classification upon fair bases. The question whether legislation of a State—effected by its constitution or statutory law—does or does not arbitrarily discriminate in violation of the equality clause is usually one of degree.[8] Nevertheless, and for a' that, when it is ordained and assured by local legislation that the representative value of an elector's vote shall be many times greater—and more and more so as time goes

---

[7] See quotation, *Park* v. *Employment Security Comm.,* 355 Mich 103, 147, note.

[8] "It is a question of degree whether I have been negligent. It is a question of degree whether in the use of my own land, I have created a nuisance which may be abated by my neighbor. It is a question of degree whether the law which takes my property and limits my conduct, impairs my liberty unduly. So also the duty of a judge becomes itself a question of degree, and he is a useful judge or a poor one as he estimates the measure accurately or loosely." Mr. Justice Cardozo's "The Nature of the Judicial Process," pp 161, 162.

on—than that of another elector whose sole offense is that of living in a heavily populated area, the presented Federal right should change its color to that of a hospitably received justiciable question.

Here we find that amendatory section 2 of said article 5 ruthlessly and progressively discriminates against great masses of citizens in favor of a minority of citizens. Those residing in the least populous portions of the State are guaranteed a steadily greater measure of legislative control, by their votes, than are those residing in the remainder of the State. The result is worse now, by far, than that which was condemned so vigorously in *Giddings, supra.* Indeed it has just become more flagrant as it bids substantial disfranchisement during the 1960's.[9]

It is said, however, that discrimination effected by the 1952 amendments is not actionable for a separate reason; that substantial inequality of voting strength was "built into the Constitution long before the Fourteenth Amendment." The reference is to the original and presently fixed right (by article 1 and amendatory article 17) of each State to 2 senators, and the inference is left that it is quite all right—despite the command of the equality clause— to build gross inequality of senatorial representation into the legislative structure of a State because

---

[9] As this supplemental footnote is written (May 21, 1960) the Detroit Free Press has just reported (under heading "A Message Written in [1960] Census Figures") that "Macomb county's population has more than doubled in a decade and that Oakland county's has increased 73.6%." Yet Macomb and Oakland counties, already deplorably shortchanged by amended section 2 in terms of senatorial representation, will continue as before with an allotment of 1 senator only for each.

To this situation it would seem that the conclusion of the court, in *Truax* v. *Corrigan,* 257 US 312, 336 (42 S Ct 124, 66 L ed 254, 27 ALR 375), is directly applicable:

"If this is not a denial of the equal protection of the laws, then it is hard to conceive what would be. To hold it not to be, would be, to use the expression of Mr. Justice Brewer in *Gulf, Colorado & Santa Fe R. Co.* v. *Ellis,* 165 US 150, 154 (17 S Ct 255, 41 L ed 666), to make the guaranty of the equality clause 'a rope of sand.' "

such was done and is now done among the States. As to this point I must have a word of rebuttal based on facts rather than judicial opinion.

Every schoolboy knows the historic reason for the "built-in" right of each State to 2 senators. The Federalists reluctantly consented to such feature of the national legislative structure for recorded reasons of fully debated compromise. The Constitution has ordained accordingly since ratification was concluded in 1790. But this provision became a part—and an exclusive part—of the National edifice only. The Fourteenth Amendment, on the other hand, did not become a part of the Constitution until 78 years later. Section 1 of that amendment, far from complementing or inferentially approving for each State the National plan of senatorial representation, was and now is a "built-in" *order directed to each State;* an order that no State shall deny "to any person" within that State the equal protection of the laws. So the Constitution by article 1 "built into" its permanent National framework that which the Fourteenth Amendment has prohibited each State—relevantly and reasonably—from doing within its borders. Article 1 (supported later by amendatory article 17) guarantees *inequality* of the representative value of a man's vote so far as concerns the National senate; whereas the Fourteenth Amendment guarantees a *substantial approximation of the very opposite* within the framework of the government of each State. This is the way—factually—the great Instrument stands at present.

---

I agree fully with Mr. Justice KAVANAGH's presentation of the case and especially with his conclusions upon the admitted as well as proven facts. But I do not agree, *MacDougall* and *South* considered, that the showing made here authorizes relief. This Court

cannot invalidate the 1952 amendments excepting by force of higher authority, arriving here in virtue of jurisdiction concurrent with that of the Federal courts. There being no such jurisdiction, applicable to cases of discrimination by local law against the representative value of a man's vote, we cannot proceed.

Finding no alternative than that of due pursuit of the majority opinions of *MacDougall* and *South,* I vote to dismiss plaintiff's petition.

Carr, J. (*concurring*). We are in accord with the introductory paragraphs and with sections 1 and 2 of Mr. Justice Edwards' opinion, and concur in his proposed disposition of the case. Plaintiff has based his right to the writ of mandamus sought by him on the Fourteenth Amendment to the Federal Constitution. The purpose, scope, and practical application of said amendment in a controversy of the character now before us has been repeatedly considered by the supreme court of the United States, and this Court must follow the decisions rendered.

In *Minor* v. *Happersett,* 21 Wall (88 US) 162 (22 L ed 627), decided shortly after the adoption of the amendment in question, the Federal supreme court in a unanimous decision rejected the claim that issues involving the right or privilege of suffrage were within the scope of the amendment, viewed in connection with other provisions of the Constitution, and the reasons underlying the adoption thereof. Said decision has been repeatedly cited in later cases. The position that the supreme court has taken with respect to controversies of this nature clearly appears from the *Minor Case,* subsequent decisions citing that case with approval, and the numerous decisions to which Mr. Justice Edwards has called attention. As pointed out in the opinion in the *Minor Case* (p 175), the Fifteenth Amendment, providing

that the right of citizens of the United States to vote should not be denied or abridged for specified reasons, would have been unnecessary if the Fourteenth Amendment was applicable in the controversy before the Court. Like comment may be made with reference to the Nineteenth Amendment relating to woman suffrage.

We agree that in the instant case the relief sought by plaintiff should be denied, and the petition dismissed, without costs.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.